# ATTORNEY GRIEVANCE COMMISSION OF MARYLAND v. WILLIAM N. DUNPHY

[Misc. (BV) No. 5, September Term, 1982.]

*Decided October 24, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Melvin Hirshman, Bar Counsel,* with whom was *Kendall R. Calhoun, Assistant Bar Counsel,* on the petitions, for petitioner.

*Thomas M. O'Malley* for respondent.

PER CURIAM:

The Attorney Grievance Commission, acting through Bar Counsel, filed a Petition for Disciplinary Action, pursuant to Maryland Rule BV9, against William Nevin Dunphy, alleging violations of the Disciplinary Rules of the Code of Professional Responsibility. The matter was referred to Judge David L. Cahoon of the Circuit Court for Montgomery County to make findings of fact and conclusions of law, pursuant to Maryland Rule BV10. After an evidentiary hearing, Judge Cahoon made the following findings:

## "FINDINGS OF FACT

"1. On or about May 22, 1981, the Respondent was formally charged in the Circuit Court for Montgomery County with violations of Article 27, Section 132, of the Annotated Code of Maryland (fraudulent misappropriation by a fiduciary); Article 27, Section 342, of the Annotated Code of Maryland (commingling and improper use of escrow funds). Subsequently, on or about June 17, 1981, Respondent was charged with violations of Article 27, Section 143, of the Annotated Code of Maryland (conversion of partnership money). On or about June 29, these matters were consolidated for trial.

"2. On December 17, 1981, the Respondent was found guilty after a jury trial of all counts of the Indictments and Informations upon which they deliberated, in violation of the statutes referred to in paragraph one.

"3. On March 8, 1982, the Respondent was sentenced to serve two years in the Montgomery County Detention Center, which sentence was subsequently reduced to eighteen months.

"4. On April 19, 1982, by Order of the Court of Appeals of Maryland, Respondent was suspended from the practice of law.

"5. On August 16, 1982, Respondent was released from the Montgomery County Detention Center and will be on parole for the remainder of his sentence.

"6. Respondent has been barred by the passage of time from seeking any or further appellate review of his conviction.

## "CONCLUSIONS OF LAW

"1. Pursuant to Maryland Rule BV10 e (1), the final judgment of conviction is conclusive proof of the guilt of the Respondent of those crimes for which he has been convicted.

"2. By virtue of his conviction of the crimes of fraudulent misappropriation by a fiduciary, theft, commingling, and improper use of escrow funds and conversion of partnership money, the Respondent has violated the following Disciplinary Rules: Disciplinary Rule 1-102 (A) (1) (3) (4) (5) and (6), Disciplinary Rule 9-102 (A) (1) and (2), Disciplinary Rule 9-102 (B) (1) (2) (3) and (4)."

Dunphy did not except to Judge Cahoon's findings but he did oppose Bar Counsel's recommendation that he be disbarred. He maintained that appropriate sanction was an indefinite suspension, relying upon *Attorney Griev. Comm'n v. Flynn,* 283 Md. 41, 387 A.2d 775 (1978). In that case, we imposed an indefinite suspension upon an attorney, rather than disbarment, where the evidence disclosed that the acts giving rise to the disciplinary charges resulted to a substantial extent from physical and mental maladies suffered by the attorney.[1] We there delineated in detail the relevant evidence depicting Flynn's personal and professional deterioration over a six-year period, as well as the causal relationship between the attorney's serious physical and mental problems, including alcoholism, and the commission of the acts of misconduct.

---

1. In the *Flynn* case, the attorney was found to have (1) neglected legal matters which were entrusted to him, in violation of DR 6-101 (A) (3); (2) deposited funds belonging to his clients in his own, rather than in a separate, bank account, in violation of DR 9-102 (A); (3) failed to maintain a complete record of his clients' funds coming into his possession and to promptly deliver to the clients these monies, in violation of DR 9-102 (B); and (4) commingled his clients' funds with his own and used them "for [a] purpose other than the purpose for which such funds were entrusted to him," in violation of the Maryland Code (1957, 1976 Repl. Vol.), Art. 10, § 44.

In support of his argument that this is a *"Flynn"* case, Dunphy, through counsel, sketched the following portrait of Dunphy's life from the evidence adduced at the disciplinary hearing:

"Mr. Dunphy served as a Bomber Pilot and engaged in combat missions during the Second World War. After the War he completed his education, married in the early 50's and began the practice of law.

"He subsequently acquired a family of five children, engaged in the practice of law in Montgomery County. For a time he had a partnership with Calvin Saunders, now a judge of the Circuit Court for Montgomery County and he served a term as President of the Montgomery County Bar Association. He appeared to have a close business and personal relationship and joined in ventures with Saunders and other professional persons such as James Wharton, another past president of the County Bar Association and Dr. Maile, a distinguished medical practitioner.

"Mr. Dunphy had been treasurer in some judicial political campaigns in which he worked with Geraldine Daysh, presently the Trust Officer for the Montgomery County Circuit Court. She had known Mr. Dunphy since 1963 or 1964 and she had supervised him when he was a treasurer in the judicial campaign and when she was appointed Trust Officer of the Court in 1968, Mr. Dunphy became one of her five auditors.

"Until 1974 his work was good and timely presented and he was a man of great integrity and was always impeccably dressed. She had seen him once a day and was on the phone with him at least once a day.

"But then in 1974 or 1975 she noticed a change. He was not dressed as well; his work became slovenly and late; in the morning she detected an odor of alcohol on his breath and she commented on all of these changes to other lawyers.

"His delinquencies as an auditor increased to the degree that Mrs. Daysh stopped making assignments to him. And Mrs. Daysh opined: 'I just knew he was a totally different human being than he was when I first met him.' And she felt that one of the contributing factors was alcohol.

"Mr. Dunphy's partners, at the time of all of these matters came to the attention of the State's Attorney, were not what one might call friendly but they did have some input regarding his condition.

"Mr. Lynch said they had formed the partnership in 1977 and it lasted about four years. Prior to that time he had known Mr. Dunphy for about twenty years. In 1977 the partners had difficulty locating Mr. Dunphy and he would not return clients' telephone calls. When they spoke to him 'he was very responsive. He'd say yes, I'm going to amend my ways and will work it out and then it would work out pretty well for about two weeks. . . . Then we wouldn't be able to find him again.'

"Mr. Carlton, the other partner, said 'He did not show up for scheduled appointments. . . . We had a little trouble keeping track of him, I guess.' 'Calls in large numbers were not being returned to clients.'

"He had seen Mr. Dunphy 'bar hopping'; he had seen him drink excessively, he had heard other people talk of his (Mr. Dunphy's) drinking from the time the firm started.

"Dr. James Ryan, a graduate of Georgetown University Medical School, 1953, and an expert in forensic psychiatry who for years testified in the United States District Court for the District of Columbia on almost a daily basis was called as an expert witness by Mr. Dunphy.

"He first saw Mr. Dunphy in May, 1981 then saw him on a weekly basis and later a bi-weekly basis.

"He learned that Mr. Dunphy came from a very close and religious family and he aspired to become a priest. That shortly after the War most of his immediate family died, culminating in the death of his brother in 1966.

"In Dr. Ryan's opinion, Mr. Dunphy functioned all right until the early 70's. He had strong unconscious guilt feelings and began to drink beer as a tranquilizer to help him over the unpleasantness of his practice and he began making 'messes.' The 'messes' began in the early 70's and became much worse over recent years and it has to do with the death

of his son, Brian, at age 19. He died about three years ago and since that time 'he hasn't been functioning very efficiently in any part of his life.' The son died by suicide.

" 'Since his son's death, basically it's been a kind of shattering effect on his whole feeling about himself. The shattering effect was that he did his work but he kept getting behind in his work. He would make up lists on what he had to do and the lists kept growing longer and longer and the more lists he had, the more messes he made in his work. So that his life really in the last two years had been a living hell. It's been constant with responding to phone calls of people complaining because he wasn't getting this or that done.

" 'Now these losses of control are happening in the court rooms, happening right in the middle of cases; they happen all the time in his domestic relations work as he would talk with people about their children and it happened when he handles juvenile clients. This has been so much of a pressure that he has finally decided to get out of these court rooms, or juveniles or working with domestic relations cases.

" 'But it goes beyond that and basically his son is in his mind all the time. He's trying desperately to understand why, how he could kill himself. Obviously he feels that he failed him as a father.'

" 'Another way to illustrate the interference in his life with this boy's death, he has a compulsion to go to the cemetery, he visits his son's grave. Well, at the same time whenever he does that he breaks down, and by that I mean that he cries and he is overwhelmed and terrible feelings of depression and he inevitably goes and drinks beer. He'll drink beer for a couple of hours.'

"Dr. Ryan testified that Mr. Dunphy had organic brain syndrome."

Judge Cahoon declined to weigh and consider the evidence of mental and physical sickness alleged by Dunphy to warrant an indefinite suspension under the rationale of *Flynn;* he believed that such consideration was beyond his authority under the Maryland BV Rules. We took a contrary

view and remanded the case to Judge Cahoon for a further evidentiary hearing to afford Dunphy an additional opportunity to testify and to adduce other evidence in an effort to sustain his position. Specifically, we directed that Judge Cahoon "make findings of fact concerning the nature of respondent's physical and mental health problems and the extent to which such problems were related to the misconduct in this case." Thereafter, Judge Cahoon conducted another evidentiary hearing and made the following supplemental findings of fact:

"The evidentiary proceedings were conducted, at which time I heard the testimony of Geraldine Daysh, Trust Clerk for the Circuit Court for Montgomery County, Maryland, the Respondent, and Dr. James A. Ryan his treating psychiatrist. Additionally, there was introduced into evidence as exhibits the evaluation of the staff of Clifton T. Perkins hospital made in relation to the criminal proceedings involving the Respondent's misconduct and the findings of the Inquiry Panel.

"From this evidence I conclude the following:

"The Respondent was admitted to practice in 1954 and undertook to maintain practice of law mostly in Montgomery County. He engaged in extensive activity in the organized bar and eventually was President of the Montgomery County Bar Association in the year 1967-1968. He was appointed as one of the Montgomery Court auditors and served thus for a number of years in which he produced accurate and timely reports. He acted as treasurer in a judicial campaign and produced complete, accurate, and timely reports relating to that function.

"Commencing in 1972 or 1973 his appearance became sloppy and his work product, particularly as produced in connection with the court audits, became untidy and untimely. It was observed that he was consuming alcohol at inapproprate times and his speech patterns were changing. His work product deteriorated and by 1976 he was no longer being utilized for court audit purposes.

"Within a year from the formation of a law partnership in 1978, his partners were having difficulties with him by his failure to attend to the business of the clients and of the partnership. By his own admission, from 1973 on drinking was the center of his life. A suicide of a son in 1978 had a profound impact upon him. Beginning in the period 1974 to 1977 he became incompetent to practice law. By May of 1981 he had developed an illness of psychotic proportions. There were profound underlying guilt reactions and there developed severe organic limitation from the use of alcohol. This brain damage was a substantial cause of the commission of the acts of misconduct for which he was convicted.

"He has eschewed any use of the drug alcohol since November 5, 1981. He participated in intensive psychotherapy sessions with Dr. Ryan from May of 1981 until approximately one year ago. He is maintaining himself in daily sessions of Alcoholic Anonymous and he has become a sponsor for other members of Alcoholic Anonymous. He assists in alcohol rehabilitation programs in Lorton Penitentiary and lawyer counseling programs in Maryland.

"He has overcome the brain damage induced by his ingestion of alcohol and has acquired a capacity to cope with his underlying guilt sensations. He has demonstrated an appropriate remorse about his misconduct.

"He has executed a portion of the period of incarceration imposed, has been placed on parole, and is currently subject to the probation imposed. He has made partial restitution to the Clients' Security Trust Fund and anticipates completing that.

"He obtained employment in an export-import sales business and recently commenced working for other lawyers by searching titles and doing research. He presents himself today as intellectually capable of practicing law and it is the opinion of his psychiatrist that he is competent. The Respondent is more cautious and recognizes that he has additional adjustments to make and a need to adhere to his current program of rehabilitation."

Having reviewed the record in its entirety, we conclude, as in *Flynn,* that there did exist in this case serious physical and mental illness at the time of the commission of Dunphy's criminal acts which, while not excusing them, were to a substantial degree causally connected and sufficiently exculpatory as to warrant our not imposing the ultimate sanction of disbarment.[2] We will instead order a sanction "that is a smidgeon less severe — suspension from the practice of law in this State for an indefinite time period." *Flynn, supra,* 283 Md. at 45. In so disposing of this case, there is, of course, no softening of our revulsion for misappropriation of funds entrusted to an attorney. As we said in *Flynn,* "there is no end to a suspension imposed in these circumstances except upon a showing, by clear and convincing evidence amounting to a moral certainty, that the malady has been removed and rehabilitation is complete so that the illegal and improper acts will never be repeated." *Flynn, supra,* 283 Md. at 47.[3]

> *Ordered that the suspension of William Nevin Dunphy from the practice of law shall be for an indefinite time period; respondent shall pay all costs as taxed by the Clerk of this Court, including the costs of all transcripts, pursuant to Maryland Rule BV15 c for which sum judgment is entered in favor of the Attorney Grievance Commission against William Nevin Dunphy.*

---

**2.** The criminal acts for which Dunphy was convicted occurred in January of 1981. At his criminal trial, Dunphy unsuccessfully filed a plea of insanity.

**3.** As of this time, claims totalling $30,159.02 have been filed with the Clients' Security Trust Fund for indemnification on account of Dunphy's defalcations. Thus far, the Fund has paid out $21,471.02. Dunphy has not made any restitution to the Fund as of the present date.