## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND v. DAVID GRANT WILLEMAIN

[Misc. (BV) No. 29, September Term, 1982.]

*Decided October 25, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Andrew Jay Graham* for respondent.

*Walter D. Murphy, Jr., Assistant Bar Counsel,* with whom was *Melvin Hirshman, Bar Counsel,* on the petition, for petitioner.

SMITH, J., delivered the opinion of the Court.

As we did in *Attorney Griev. Comm'n v. Finlayson,* 293 Md. 156, 442 A.2d 565 (1982), among other cases, we shall attempt in this attorney disciplinary proceeding to use procedures directed at rehabilitation of the attorney.

Bar Counsel, acting pursuant to the provisions of Maryland Rule BV9, filed a petition with us on behalf of the Attorney Grievance Commission seeking disciplinary action against David Grant Willemain, a member of the Maryland Bar since June 20, 1974. The main thrust of the charges grew out of his representation of a client, Helen H. Shaw, who entrusted the sum of $42,500 to him to be invested in loans secured by second mortgages. It was alleged that he failed to advise Mrs. Shaw that two borrowers were clients of his and that over half of the loan to one individual would be applied to a legal fee due from that individual to Willemain. It was further alleged that Mrs. Shaw entrusted to Willemain collection of the monthly payments on these mortgages and that Willemain failed to remit promptly to Mrs. Shaw the sums due her. It was charged that Willemain "knowingly misappropriated and converted to his own personal use funds from mortgage payments which he had received on behalf of Mrs. Shaw," that he "commingled with his own funds [ ] funds from [such] mortgage payments," that at various times he "used portions of the funds from [these] mortgage payments . . . for purposes unrelated to the purposes for which the said funds had been entrusted to him," and that "in the course of his practice of law generally [Willemain] presented to Clerks of Maryland Courts checks

drawn by him for filing fees, recording costs or court costs which checks were returned for insufficient funds on at least seven occasions."

Pursuant to Rule BV9 b we referred the matter for hearing to a judge of the Circuit Court for Baltimore County. He heard live testimony and considered a number of exhibits together with the transcript of the hearing before the inquiry panel which was admitted into evidence by stipulation. The trial judge summarized the evidence in his report to us:

> "The evidence clearly shows that the Respondent represented Helen H. Shaw in numerous legal matters and she was well satisfied with the services rendered to her up until her sale of various real estate parcels. As a result of the sale, Helen Shaw had an excess of funds from which she decided to place $42,500.00 as loans for second mortgages after discussions with her personal advisors and the Respondent. The Respondent arranged for these loans with the following borrower-mortgagors, Mr. Nelson Lee Gamber, Mr. and Mrs. Peter Lodgen, Mr. and Mrs. Ronald Der Motta, and Mr. and Mrs. R. Joseph Cason.

> "At the time that Mrs. Shaw actually made the loans, Mr. Nelson Lee Gamber, and Mr. and Mrs. Ronald Der Motta were clients of the Respondent in other matters. After discussion with Mrs. Shaw as to the collection of the mortgage payments, Respondent volunteered that he could make the collections and Mrs. Shaw agreed for him to collect the mortgage payments and remit them to her monthly for a fee.

> "The Respondent collected and remitted the mortgage payments promptly from January 1978 through February 1979, but thereafter substantial gaps resulted in the remitting of the mortgage payments to Mrs. Shaw to the extent that she was required to make appointments with him to obtain

the payments. Mrs. Shaw testified that at each conference with the Respondent, he would assure her that payments would be remitted promptly, although these representations were not complied with. Further Respondent does not deny making the representations.

"Testimony also indicates that Mrs. Shaw had knowledge of the relationship of the mortgagors with the Respondent and that she was aware that part of the mortgage proceeds borrowed by Mr. Gamber were to be used to pay his divorce expenses, but she testified that she did not know that the funds were for attorney's fees, payable to the Respondent. She testified that she would have acted differently had she so known. The Respondent stated that the use of a portion of the funds to support the litigation costs was explicitly disclosed to Mrs. Shaw.

"A review of the transcript of testimony at the Inquiry Panel level discloses that Mr. Nelson Gamber, and Mr. and Mrs. Ronald Der Motta, and Mr. and Mrs. Peter E. Lodgen, mortgagors of Mrs. Shaw, testified concerning the circumstances regarding the placement of their mortgages. According to the transcript Mr. and Mrs. Der Motta were very well satisfied with the services rendered to them by the Respondent; however, Mr. Gamber complained of the service performed by him and the end result was a fee dispute with the Respondent supported by confusing and conflicting testimony of Mr. Gamber, suggesting Mr. Gamber's lack of understanding of the nature of the Respondent's services.

"The evidence further discloses that Mr. and Mrs. Peter E. Lodgen filed for bankruptcy in the United States District Court for the District of Maryland and the resolution of their debt to Mrs. Shaw is still pending.

"The transcript also disclosed the testimony of two character witnesses, Carolyn Featherstone, a client, and Betty Alperstein, former secretary. Their respective testimony discloses that the Respondent was a capable and hard-working attorney, but he had a substantial deficiency in bookkeeping requirements and law office management. The bookkeeping and management deficiencies were also substantiated by other witnesses, including the Respondent.

"During the period of the mortgage loans, Respondent's able bookkeeper, Ms. Terry Wheeler, resigned and he was unable to hire another with the competence of the former although he tried several.

"The evidence disclosed that the mortgage payments were paid into an escrow account which said account also included retainers and payments from other clients. The evidence disclosed that the Respondent withdrew counsel fees that were earned by him and there was no testimony that these monies were deposited into a separate trust account for the deposit of funds belonging essentially to his clients only.

"On April 9, 1980, the Respondent received a check in the amount of $267.08 from Mr. and Mrs. Der Motta which said check was charged against the Der Motta's checking account on April 11, 1980. The bank statements of the Respondent's escrow account do not reflect that the check was deposited therein. Although the Respondent has insisted that the check was deposited in the escrow account, but he is unable to explain why it is not reflected in his bank statement. On September 10, 1979, there was a balance of $3,431.02 in the Maryland National Bank escrow account; however, on the same date the Respondent drew check #349 in the amount of $2,000.00 from the escrow account and deposited it in the general account at Mercantile Bank and

Trust Company. On September 16, 1979, Respondent drew check #351 in the amount of $1,500.00 on the escrow account and on September 17, 1979, deposited this in the general account at the Mercantile Bank and Trust Company. By September 19, 1979, Respondent's escrow account at Maryland National Bank was overdrawn by $73.00. . . . During the June through November 1979 period, the Respondent was withdrawing funds from the escrow account for earned fees on other cases. It is clear that the money during this period was not used for Mrs. Shaw's purposes but for office use. From the period of June through November 1979, the Respondent collected $3,291.20 on the mortgage payments which amount was not paid to Mrs. Shaw until December 6, 1979.

"The evidence discloses that on September 17, 1980, the Respondent drew a check from the escrow account in the amount of $750.00 payable to cash. The Respondent could not explain what he did with the proceeds.

"The evidence also disclosed that checks drawn by the Respondent on his general law office account at the Savings Bank of Baltimore made payable to clerks at the various courts were returned 'insufficient funds'. These were not reconciled.

"During the period between August 14, 1980, and December 9, 1980, Mrs. Shaw's balance with the Respondent was less than the amount she was entitled to receive but the Respondent is unable to adequately explain the reasons for the imbalance.

"The Respondent admitted his inability to maintain his bookkeeping requirements after Mrs. Wheeler, the competent bookkeeper, left.

"In mitigation, the evidence discloses that he did attempt to hire some bookkeepers who were ineffective. During this period of time, the Respondent was

handling an extensive case load and it is apparent that he lost control of his law office management. As another mitigating factor, the Respondent was on tranquilizers and drinking heavily. He was having personal and emotional problems with his marriage, and he did seek marriage counselling in 1980. Further, he was having physical problems with his back during 1979, and at times was unable to physically sit up. He had the herniated disc removed in 1981.

"There is no evidence that the Respondent intentionally attempted to milk his clients but it appears that he lost control. He was unable to face the problem and help to solve it during the period of time in question.

"The testimony discloses that Dr. J. Alan Lebow, a licensed clinical psychiatrist, is presently treating the Respondent as well as Dr. Charles Whitfield, Assistant Professor of Psychiatry at the University of Maryland School of Medicine. Dr. Whitfield is the psychiatric counsellor for the Medical-Chirurgical faculty as well as the Lawyer's Counseling Service of the Maryland State Bar Association. The Respondent has been attending group therapy through Alcoholics Anonymous. Further, the Respondent is being counselled by Mr. Richard B. Vincent, Director of the Lawyer's Counseling Service Committee for the Maryland State Bar Association. This counselling relates to the Respondent's drug and alcohol abuse and is also intended to help the Respondent in his law office management.

"Letters relating to the Respondent's character and competence from Judge John F. Fader, II, and from Mr. Eugene P. Smith, an attorney with Weinberg and Green, were introduced and accepted by the Court.

"The evidence appears to the Court that the Respondent is now in control of his medical and emotional problems as well as control over the proper management of his law office."

The trial judge made the following specific findings of fact:

"1. The evidence before this court clearly shows that the Respondent neglected to competently and adequately represent Mrs. Helen H. Shaw concerning the collection and remittance of the mortgage payments to her.

"2. The Respondent did not adequately and fully disclose to his clients the potential conflicting risks which could have arisen with the placing of the mortgages.

"3. The Respondent did not adequately and fully disclose to Mrs. Shaw the personal benefit to him in the form of payment of a fee by Mr. Nelson Gamber from the mortgage loan.

"4. Respondent at times used the amount paid on the Shaw mortgages for his personal use to establish sufficient balances in his various accounts and to draw fees to himself for work performed for other clients."

The trial judge's conclusions were:

"1. Respondent's failure and neglect to adequately represent Mrs. Helen H. Shaw constitutes a violation of the Code of Professional Responsibility, Section 6-101 (A) (3) and 7-101 (A) (2).

"2. The Respondent's failure to adequately and fully disclose to Mrs. Helen H. Shaw of [sic] conflicting interests constitutes a violation of the Code of Professional Responsibility, Sections 5-104, 5-105 and 7-101 (A).

"3. The Respondent's failure to adequately and fully disclose to Mrs. Helen H. Shaw the fee he was to receive from Mr. Nelson Gamber from

the mortgage proceeds constitutes a violation of the Code of Professional Responsibility, Section 5-101.

"4. The Respondent's use and commingling of his client's funds for personal use, although not with criminal intent, constitutes a violation of the Code of Professional Responsibility, Section 9-102."

He further concluded "that the Respondent did engage in misconduct as defined by Rule BV1 (j) of the Maryland Rules of Procedure and is guilty of same."

Bar Counsel has excepted to certain of the findings of fact and conclusions of law in an obvious attempt to secure the sanction of disbarment. Willemain has likewise excepted in the obvious hope that he may hold any sanction to a minimum. We overrule both sets of exceptions.

It is important to point out that the trial court found that Willemain lost control over the proper management of his law office, that he did not act with criminal intent, and that he was withdrawing funds from the escrow account for earned fees on other cases. These findings reflect, in light of the way in which the case was tried and argued, that the trial judge accepted Willemain's explanation that his use of Mrs. Shaw's funds resulted from negligence on his part and a mistaken belief that he was withdrawing funds representing fees then due to him. Because there was evidence relating to Willemain's difficulties in hiring an experienced bookkeeper, his own poor bookkeeping practices, and his abuse of alcohol and Valium, we cannot say that the trial judge's conclusion is clearly in error.

At oral argument there was submitted to us a letter from the director of the Lawyer Counseling Committee of the Maryland State Bar Association to Willemain's attorney. It states in pertinent part:

"In the past, the Court of Appeals has seen fit to place an attorney on supervised probation rather than suspension or disbarment. The specific condi-

tions which have involved the Lawyer Counseling Committee and seem pertinent in this instance have been:

'(1) He shall participate in such activities as may be prescribed from time to time by the Director of the Lawyers' Counseling Program of the Maryland State Bar Association.

'(2) He shall maintain active membership in and participation with Alcoholics Anonymous.'

"Due to Mr. Willemain's enthusiastic participation in all of my recommendations for his personal recovery, I will be glad to act as his probation officer within the limits of my expertise."

A letter was also submitted from the Director of the Alcohol and Drug Abuse Program of the School of Medicine of the University of Maryland. That letter, dated September 14, 1983, also was addressed to Willemain's attorney. It said:

"David Willemain continues to progress satisfactorily in treatment by his regular attendance at AA (nearly one *a day*), group therapy, and is alcohol and drug free since Feb '82 and Jan '83 respectively.

"I am pleased with his progress.

"I will advise you through Richard Vincent if treatment does not continue satisfactorily." (Emphasis in original.)

We have looked at the shortcomings of attorneys in a somewhat different light where we have concluded that the acts giving rise to the charges against an attorney have resulted to a substantial extent from the physical and mental maladies the attorney was suffering, particularly where alcoholism was involved. *See, e.g., Finlayson,* 293 Md. 156, *Attorney Griev. Comm'n v. Flynn,* 283 Md. 41, 387 A.2d

775 (1978), and *Attorney Grievance Comm'n v. Cooper,* 279 Md. 605, 369 A.2d 1059 (1977). Willemain testified, "Alcohol has been a major problem for me during most of my adult life. It was increasingly a problem during this period of time, and I was drinking very heavily in 1979 and into 1981." He referred to "short term black-outs." The trial judge, in that which we have quoted, referred to Willemain's testimony as to substantial marital problems during the period in question, that he and his wife "started marriage counseling in 1980," and that during this same time frame he had back problems.

As we recognized in *Finlayson,* 293 Md. at 159, the disease of alcoholism is such that those who say and believe that they are cured do not always remain so. In that case the Director of the Maryland State Bar Association Program testified that total abstinence is the only effective treatment for alcoholism. It is obvious that if Willemain were to resume drinking his clients might again suffer before the grievance procedure could remove him from practice. Given the fact that Willemain's misconduct here appears to have been triggered by his bout with the bottle and the further fact that in the final analysis there appears to have been no financial loss on the part of Willemain's client, we conclude that disbarment is not the sanction that should be imposed. Rather, we believe that to protect the public from Willemain's incompetence in the handling of accounts, including his delays in remitting funds due to clients, he must be indefinitely suspended from the practice of law in this State effective thirty days from the filing of this opinion.

We wish, however, to leave the door open to his rehabilitation as a useful and reputable member of the legal profession of this State. Accordingly, this suspension is without prejudice to Willemain's right to apply immediately to us for reinstatement. There was an indication that Willemain would prefer to practice with another or others. Moreover, practicing with another would provide a monitor upon Willemain's activities. In making such application he must understand that he will only be reinstated if he meets the following conditions:

1. He shall participate in such activities as may be prescribed from time to time by the Director of the Lawyers' Counseling Program of the Maryland State Bar Association.
2. He shall maintain active membership in and participation with Alcoholics Anonymous.
3. He shall be associated with another member of the Bar of this Court who shall monitor his activities as a practicing lawyer and report promptly to Bar Counsel should Willemain fail to act promptly on behalf of his clients. That attorney's consent and an indication of his willingness to so act shall be appended to any petition for reinstatement.
4. He shall pay all costs incurred in connection with this proceeding on such schedule as Bar Counsel may specify taking into consideration Willemain's income and his obligations and responsibilities to his wife and children.

Willemain must understand that a breach of any one of the above conditions will be grounds for renewal of his indefinite suspension. It goes without saying that if Willemain is reinstated and if he at any time disagrees with monetary requirements imposed by Bar Counsel, he may file exceptions with us.

> *It is so ordered; respondent shall pay all costs as taxed by the Clerk of this Court, including the cost of transcripts, pursuant to Maryland Rule BV15 c for which sum judgment is entered in favor of the Attorney Grievance Commission against David Grant Willemain.*