614 A.2d 955

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

James J. WHITE, III.

Misc. (Subtitle BV) No. 18, Sept. Term, 1991.

Court of Appeals of Maryland.

Nov. 6, 1992.

Melvin Hirshman, Bar Counsel, Crownsville, for the Attorney Grievance Commission of Maryland.

William A. Lee Clarke, III, Salisbury, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

On January 9, 1992, James J. White, III, a member of the Maryland Bar since 1963, was charged by the Attorney Grievance Commission, acting through Bar Counsel, with violations of Rule 1.15 (Safekeeping Property) and Rule 8.4 (Misconduct) of the Rules of Professional Conduct, as well as with violating Maryland Code (1989), §§ 10–306 to –307 of the Business Occupations and Professions Article. We referred the matter, pursuant to Maryland Rule BV9 b, to Judge Theodore R. Eschenburg of the Circuit Court for Worcester County to make findings of fact and conclusions of law.

On June 16, 1992, after an evidentiary hearing, Judge Eschenburg found that White represented Marlene E. Steward and her minor child, Larry, Jr., then fourteen months old, in connection with a motor vehicle accident which occurred on December 23, 1980 and which resulted in the

death of the father, Larry Steward, Sr. White settled the claims of the wife and minor child for $20,000. After deducting his fee and expenses, White disbursed the net sum of $11,982 to Mrs. Steward. Judge Eschenburg found that $5,000 of this amount was subsequently placed in a certificate of deposit in a local bank in the names of James J. White, III, as trustee for Larry, Jr. and Marlene, or the survivor of them. By February of 1989, that sum, with the addition of interest, had increased to $10,252.20. At that time, White transferred the funds to a money market account in The Chesapeake Bank, directing that the statements be sent to his home rather than to his office.

Judge Eschenburg found that Mrs. Steward died on March 19, 1989. Thereafter, an uncle of Larry, Jr. consulted White with respect to adopting the minor child, which White accomplished for him. White never advised the uncle of the existence of the money market account entrusted to him for Larry, Jr.

Between August 30, 1989 and May 5, 1990, as found by Judge Eschenburg, White, in a series of withdrawals, withdrew $10,450 from the trust account, leaving a balance of only $238.29. As a result of information received by Bar Counsel, White was asked to account for Larry's money. Bar Counsel was told that $14,147.16 was then on deposit with The Chesapeake Bank. White did not at that time acknowledge that the money had been used by him for his own purposes and then replaced.

In his findings, Judge Eschenburg referred to a stipulation between White and Bar Counsel that White had testified falsely before an Inquiry Panel concerning his use of the trust account monies; and that these funds had actually been used by him "for personal and office expenses and that he knew at the time of the use of the funds that those funds were misused by him." According to Judge Eschenburg, the evidence disclosed that White "hoped that the misuse of funds would escape detection and that ultimately, if called upon to account for the funds, he would replace the misused funds with other funds available to him." Judge

Eschenburg found from the evidence that White replaced the misappropriated funds prior to the misuse coming to the attention of the Attorney Grievance Commission and that White had added an additional sum to these funds representing interest which would have been earned if the fund had remained untouched.

At the hearing, White testified, as did Richard B. Vincent, Director of Lawyer Counseling for the Maryland State Bar Association, that White "suffered from severe alcoholism until on or about January 1992" when he contacted Vincent for help. The evidence further disclosed that Vincent referred White to an in-patient alcoholism treatment facility where White underwent and successfully completed the treatment program from January 22 through February 21, 1992. Thereafter, according to Judge Eschenburg's findings, White regularly attended meetings of Alcoholics Anonymous and related counseling and maintained complete abstinence from alcohol.

In his findings, Judge Eschenburg acknowledged White's testimony that at the time he misappropriated the trust funds, he "rationalized his behavior or justified it as borrowing." He also referred to Vincent's "expert testimony that such rationalization or justification was consistent with alcoholic thinking" and that the prognosis for White's conducting a successful recovery from alcoholism and complete abstinence was excellent.

Judge Eschenburg concluded that White had violated the "Safekeeping Property" provisions of Rule 1.15(a), (b), and (c) and Rule 8.4(b), (c), and (d).[1] He also found that White

---

1. Rule 8.4(b), (c), and (d) provide:
 "(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
 (d) engage in conduct that is prejudicial to the administration of justice."

had violated §§ 10–306 and 10–307 of the statute, as charged in the disciplinary petition.[2]

In response to Judge Eschenburg's findings, White states that "after almost thirty years of practicing law, without being the subject of any disciplinary proceeding, . . . while in the throes of severe alcoholism, [he] misappropriated funds which he held in trust." He invited our attention to the fact that he subsequently replaced those funds, with interest, before he had knowledge of any disciplinary proceedings against him. He acknowledged that he "compounded his misconduct, while still drinking alcoholically, by denying the misappropriation before the Inquiry Panel." He maintained that after he voluntarily sought treatment for his alcoholism through Mr. Vincent, he admitted and accepted responsibility for his transgressions both in a prehearing deposition and in his testimony before Judge Eschenburg.

White urges that we find his misconduct to be causally related to his severe alcoholism and resultant alcoholic rationalization. He claims that Judge Eschenburg, based upon Mr. Vincent's uncontroverted expert testimony, recognized that he "suffered from severe alcoholism until on or about January 19, 1992."

Bar Counsel, in response, noted that White's admission that he misappropriated the funds was not made until April 14, 1992, after his bank records were subpoenaed, and that it was only after that that he admitted his misconduct. As to sanction, Bar Counsel contends that disbarment is the appropriate disposition for White's misconduct. He maintains that the suggested nexus between White's use of alcohol and his misconduct in misappropriating the trust funds was "tenuous at best," falling short of the requisite

---

**2.** These statutory provisions proscribe the use of trust money by a lawyer for "any purpose other than the purpose for which the trust money is entrusted to the lawyer" and make violations subject to disciplinary proceedings under the Maryland Rules.

proof that White's alcoholism was a precipitating cause of the theft of his client's funds.

Our review of the evidentiary record before Judge Eschenburg includes White's prehearing deposition. It reveals that White acknowledged that from 1988 through 1990, when the funds were in the process of being misappropriated, he was "drinking alcoholically and gambling excessively." He acknowledged lying to the Inquiry Panel when he said that he was sober and was not a recovering alcoholic. White also agreed with his lawyer's proffer during the taking of his deposition that

"it would be [White's] testimony that when he began taking the money from the account in question, . . . he knew it was not his money, that like most people who set out on that course of conduct, he rationalized or lied to himself and told himself that he would borrow the money and pay it back with interest. In any event, over a period of close to two years, he continued to take money from that account until he had taken all of it . . ., that no one would demand an accounting or funds from that account before he could put the money back in there, that while he was representing the adoptive father who was adopting the boy, he did not tell the adoptive father or the guardian anything about the existence of the account because he knew the money that was supposed to be in there was not in there because he had stolen it. He knew it was wrong when he did it, he knew it was wrong when he continued to take it. He did eventually, before or shortly before being caught and confronted by the Attorney Grievance Commission, he did replace all of the money in the account, with interest. . . ."

█ We have said time and again that misappropriation of funds by an attorney " 'is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction.' " *Attorney Griev. Comm'n v. Bakas*, 323 Md. 395, 404, 593 A.2d 1087 (1991); *Attorney Griev. Comm'n v. Ezrin*, 312 Md. 603, 608–09, 541 A.2d 966 (1988).

Our cases have "looked at the shortcomings of attorneys in a somewhat different light where ... the acts giving rise to the charges against an attorney have resulted to a substantial extent from the physical and mental maladies the attorney was suffering, particularly where alcoholism was involved." *Attorney Griev. Comm'n v. Willemain,* 297 Md. 386, 395, 466 A.2d 1271 (1983). Otherwise stated, we said in *Attorney Griev. Comm'n v. Miller,* 301 Md. 592, 608, 483 A.2d 1281 (1984), "that problems attributed to alcohol addiction may present circumstances sufficient to warrant sanction less severe than disbarment," *i.e.,* where the addiction has been proven, "we have ordered indefinite suspension when the addiction was to a substantial extent responsible for the conduct of the attorney." *See, e.g., Attorney Griev. Comm'n v. Aler,* 301 Md. 389, 483 A.2d 56 (1984); *Attorney Griev. Comm'n v. Nichols,* 301 Md. 172, 482 A.2d 499 (1984); *Attorney Griev. Comm'n v. Dunphy,* 297 Md. 377, 467 A.2d 177 (1983); *Attorney Griev. Comm'n v. Finlayson,* 293 Md. 156, 442 A.2d 565 (1982); *Attorney Griev. Comm'n v. Cooper,* 279 Md. 605, 612, 369 A.2d 1059 (1977).

██ In determining whether the evidence before the hearing judge was legally sufficient to establish a causal relationship between the misconduct and the alcoholism, we have at times focused on whether the alcoholism was the "root cause" of the professional misconduct, *i.e.,* whether it was responsible for the misconduct. *See Attorney Griev. Comm'n v. Truette,* 299 Md. 435, 446, 474 A.2d 211 (1984). We used similar language in *Attorney Griev. Comm'n v. Willemain,* 305 Md. 665, 680, 506 A.2d 245 (1986); there, in determining whether the evidence showed that alcoholism was a substantial factor in bringing about the misconduct, we sought to ascertain whether the alcoholism was "at the root" of the professional misconduct, *i.e.,* whether the erring attorney was "not his own master." Earlier, in *Willemain I, supra,* 297 Md. at 396, 466 A.2d 1271, we expressed the same thought in these terms: whether the misconduct was "triggered by the [attorney's] bout with the bottle."

We have thus made clear that where alcoholism is allegedly implicated in cases involving misappropriation of trust or client funds, a sanction less severe than disbarment may be imposed if the evidence discloses that the alcoholism, to a substantial extent, was the responsible, the precipitating, the root cause of the misappropriation. More, therefore, is required to establish the requisite causal relationship than a mere recitation of the attorney's life style and lengthy history of alcoholism. *See Bakas, supra,* 323 Md. at 403, 593 A.2d 1087. Indeed, in *Willemain II, supra,* 305 Md. at 676, 506 A.2d 245, as here, the erring attorney characterized his misappropriation of trust funds as "borrowing" and sought to justify his action by reason of his alcoholism. We there recognized that "[b]orrowing obviously is a volitional act," as to which attorneys sometimes " 'find themselves in a position where the flow of cash in their practice is insufficient to meet office overhead, family needs, and the like,' " which may result in "the temptation to dip into funds which have been entrusted to the attorney, with the thought that the money soon can and will be paid back and the hope that no one will be the wiser." *Id.* at 676, 506 A.2d 245, quoted in *Attorney Griev. Comm'n v. Pattison,* 292 Md. 599, 607–08, 441 A.2d 328 (1982). A sanction less than disbarment, to be justified, must therefore demonstrate more than that the attorney is an alcoholic and that, as Vincent's testimony seemed to suggest, the theft was therefore a necessary product of that disease. In this regard, we may accord evidentiary significance to the fact that a lawyer, who claims that the misconduct was the result of mental illness or a drug or alcohol addiction, carried on an effective law practice for a substantial period during the time of the misconduct without any adverse effect on the lawyer's clients. *See, e.g., Bakas, supra,* 323 Md. at 403, 593 A.2d 1087; *Attorney Griev. Comm'n v. Winters,* 309 Md. 658, 667, 526 A.2d 55 (1987); *Attorney Griev. Comm'n v. Nothstein,* 300 Md. 667, 686, 480 A.2d 807 (1984).

Both White and Vincent testified before Judge Eschenburg as to White's thirty-year history of progressively worsening alcoholism and that because of it White's thinking was "alcoholically impaired." White testified that his income from the practice of law was on the decline at the time he misappropriated the trust funds; that he was drinking and gambling excessively when he stole the money and needed it to pay his office expenses; and that because of his drinking, he rationalized the theft of the money as "acceptable behavior, although he knew that it was not, even though he intended to replace the misappropriated funds." White stated that he had been drinking "heavy" when he appeared before and lied to the Inquiry Panel. He acknowledged having been found guilty on two earlier occasions of driving under the influence of alcohol and of having been put on probation under the Drinking Driver Monitor Program and directed to attend meetings of Alcoholics Anonymous, which he did while continuing to drink. He acknowledged that he had been arrested on a third DWI offense but that that case had not then been scheduled for trial.

Vincent testified that it was "consistent" with White's "alcoholic thinking" that he had a right to "borrow" the trust funds and that had White not been an alcoholic he would not have stolen the money. Vincent stated that there was a "connection" between White's thinking processes when he took the funds and his alcoholism. On cross-examination, Bar Counsel asked Vincent whether White, despite his alcoholism, knew what he was doing when he misappropriated the funds. Vincent said that was probable; nevertheless, he said that it was White's drinking that "allowed him to do it."

As we see it, the evidence before Judge Eschenburg amounted to little more than a recitation of White's lengthy history of alcoholism and a generalized claim that the theft was caused by his alcoholism. In view of the dearth of substantive evidentiary support, it is apparent that Judge Eschenburg found it unnecessary to make a factual finding

as to the existence of a causal relationship. That he made no such specific factual finding does not, in the circumstances of this case, require a remand for that purpose. Simply to show that the attorney was in the throes of alcoholism at the time he misappropriated client funds; that his thinking was "alcoholically impaired" to the point where he rationalized his behavior as "acceptable," even though he knew it was not, is insufficient mitigation of itself to justify a sanction less than disbarment. Evidence that White's misconduct was, to a substantial extent, precipitated by his alcoholism is woefully absent in this case. Accordingly, we think the appropriate disposition is disbarment, and we shall order that the name of James J. White, III shall be stricken from the rolls of those authorized to practice law in Maryland.[3]

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV 15c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JAMES J. WHITE, III.

ROBERT M. BELL, Judge, dissenting.

It may very well be that the ultimate disposition in this case properly is disbarment, as the majority holds. Because, however, in the hearing below, the respondent raised the issue of the causal relationship between his acts of misconduct and his alcohol addiction, but the trial court did not resolve it, that holding is now premature. In my view, it is inappropriate to decide the issue of causal relationship as a matter of law on this record. Therefore, I would

---

3. On September 21, 1992, White was convicted by a jury in the Circuit Court for Kent County of theft over $300 and fraudulent misappropriation of funds by a fiduciary. *See* Maryland Code (1992 Repl.Vol.), Art. 27, §§ 342 and 132 respectively. Sentencing is now pending.

remand so that the hearing court can make that determination.

Heretofore, when, having been found to have engaged in misconduct warranting disbarment, an attorney alleged that his or her addiction caused the acts giving rise to the charges brought against him or her, and offered proof of that allegation, the burden being on the attorney, *see Attorney Griev. Comm'n v. Winters*, 309 Md. 658, 663 n. 2, 526 A.2d 55, 57 n. 2 (1987); *Attorney Griev. Comm'n v. Clinton*, 308 Md. 701, 706, 521 A.2d 1202, 1204 (1987); *Attorney Griev. Comm'n v. Deutsch*, 294 Md. 353, 366, 450 A.2d 1265, 1271 (1982), we have required the hearing court to resolve the matter. In other words, we have looked to that court's findings to determine whether the attorney has met his or her burden to establish mitigating or extenuating circumstances sufficient to justify a lesser sanction. *See Attorney Griev. Comm'n v. Bakas*, 323 Md. 395, 404, 593 A.2d 1087, 1092 (1991); *Attorney Griev. Comm'n v. Ezrin*, 312 Md. 603, 608–609, 541 A.2d 966, 969 (1988); *Attorney Griev. Comm'n v. Winters*, 309 Md. 658, 663, 526 A.2d 55, 57 (1987); *Attorney Griev. Comm'n v. Haupt*, 306 Md. 612, 614–16, 510 A.2d 590, 591–92 (1986); *Attorney Griev. Comm'n v. Willemain*, 305 Md. 665, 679–80, 506 A.2d 245, 252–53 (1986); *Attorney Griev. Comm'n v. Newman*, 304 Md. 370, 377, 499 A.2d 479, 483 (1985); *Attorney Grievance Commission v. Truette*, 299 Md. 435, 446, 474 A.2d 211, 217 (1984); *Attorney Griev. Comm'n v. Dunphy*, 297 Md. 377, 382–85, 467 A.2d 177, 179–81 (1983); *Attorney Griev. Comm'n v. Finlayson*, 293 Md. 156, 158–60, 442 A.2d 565, 567 (1982). Unless the attorney proved that such circumstances existed, disbarment was mandated. Proof that an attorney is addicted to alcohol and, further, that his/her addiction "was to a substantial extent responsible for the conduct of the attorney", *Attorney Griev. Comm'n v. Miller*, 301 Md. 592, 608, 483 A.2d 1281, 1290 (1984), sufficed. When evidence tending to prove the causal relationship of the attorney's addiction to the misconduct had been produced, but the court did not make a finding on the issue, one way or the other, we have not hesitated to remand the

case with directions to the trial court to make such a finding. *See e.g. Bakas*, 323 Md. at 405, 593 A.2d at 1092; *Truette*, 299 Md. at 443, 474 A.2d at 215.

The majority acknowledges that the respondent adduced testimony concerning his alcoholism, its duration and extent. The respondent testified about his historical involvement with alcohol and as to his perception of its effect on the charged misconduct, opining,—the hearing court and the majority characterize his opinion as "rationalization"— that his acts of misconduct were caused by the alcoholism. In addition, Richard Vincent, the Director of the Maryland State Bar Association's Lawyer Counseling Committee, to whom the hearing court referred as an expert, testified to a "connection" between the respondent's thinking processes when misappropriating client funds and his alcoholism. He also testified that his drinking, *i.e.*, his alcoholism, "allowed [the respondent] to do it." The respondent did not produce any other expert testimony; he did not call any medical experts, such as psychiatrists or psychologists.

The majority "finds" the "[e]vidence that White's misconduct was, to a substantial extent, precipitated by his alcoholism ... woefully absent in this case." [Op. at 421]. It characterizes the evidence produced by the respondent as "little more than a recitation of White's lengthy history of alcoholism and a generalized claim that the theft was caused by his alcoholism." [Op. at 420]. Therefore, it excuses the hearing court from having to make a factual finding concerning the existence, or not, of a causal relationship, explaining:

> Simply to show that the attorney was in the throes of alcoholism at the time he misappropriated client funds; that his thinking was "alcoholically impaired" to the point where he rationalized his behavior as "acceptable," even though he knew it was not, is insufficient mitigation of itself to justify a sanction less than disbarment.

[Op. at 421].

I believe that the evidence produced by the respondent generated the issue of whether the respondent's misconduct

was causally related to his alcoholism. It was, therefore, incumbent upon the hearing court to resolve that issue, one way or the other. Had it made the "findings" that the majority does, I would unhesitatingly join in the disbarment disposition. That court would have had the benefit of the warm record; it would have seen the witnesses and would have been able to assess their credibility. This Court does not have that vantage point. Therefore, it is inappropriate for it to have done so.

Unlike the attorneys in the majority of cases in which alcoholism has been found to be causally related to ethical violations, *e.g. Truette*, 299 Md. at 443, 474 A.2d at 215; *Winters*, 309 Md. at 664, 526 A.2d at 57; *Miller*, 301 Md. at 609, 483 A.2d at 1290; *Nothstein*, 300 Md. at 670–74, 480 A.2d at 809–12, the respondent did not offer any expert medical evidence, offering only his own testimony and the expert testimony of Mr. Vincent. The majority does not expressly require the offer of expert medical evidence as a predicate to the court's consideration of whether, or finding that, the causation issue has been generated and proven. And it does not even purport to do so. But that may be the practical effect of this holding. The evidence in this case absent expert medical evidence, compares favorably with that in cases in which a causal relationship has been found; by characterizing it as insufficient as a matter of law, the majority sends a strong hint that more expert testimony is required, that an expert other than Mr. Vincent must be presented. To the extent that that is what is intended or will be the interpretation, I can see no reason to prefer the opinion of one expert over that of another, except insofar as the trier of fact chooses to accept one over the other.

In the cases on which the majority relies for the proposition that the evidence in this case is insufficient to show causation as a matter of law, it was the hearing court that addressed the causation issue; in some, it found causation, *see Truette*, 299 Md. at 443, 474 A.2d at 215; *Attorney Griev. Comm'n v. Willemain*, 297 Md. 386, 394, 466 A.2d 1271, 1274 (1983); while in others it did not. *Bakas*, 323

Md. at 401, 593 A.2d at 1090; *Winters,* 309 Md. at 664–65, 526 A.2d at 58; *Nothstein,* 300 Md. at 684–85, 480 A.2d at 816. In each of the cases where the hearing court found no causal relationship, we held that finding not clearly erroneous; we did not hold that it was correct as a matter of law. Thus, it was in upholding the hearing court's findings that we commented in *Bakas* that "[t]he court] indicated, we think correctly, that the report contained little detail or substance to support her opinion." *Bakas,* 323 Md. at 403, 593 A.2d at 1091. It was in the same context that we mentioned in *Nothstein* that "[d]uring the period of Nothstein's misconduct he not only carried on a practice without any problems insofar as the record shows, but at the same time wrote a treatise on an aspect of labor law for a national publisher." *Nothstein,* 300 Md. at 686, 480 A.2d at 817. Just as significant is our statement of conclusion: "We *cannot say* that the trial judge was clearly in error when she concluded that '[t]he proof offered by the Respondent was not clear and convincing that he was so mentally ill that he could not control his conduct.'" *Id.* (emphasis added).

It may be that the distinction the majority seeks to draw is between cases in which there is evidence that the attorney has acted calculatingly and those where the evidence to that effect is less clear. The majority emphasizes counsel's proffer which indicates that the respondent knew the money he misappropriated was not his, but nevertheless set out on a deliberate course to use it, rationalizing that he would not be caught. The majority then tells us that causation was not shown in this case because no strong substantive evidence was presented. It does not tell us, unfortunately, what would have sufficed as such evidence. The "guidance" it gives is not at all helpful in determining when a hearing court must make findings and when it may not. Certainly, whatever the context of the misappropriation, what the majority has said here will have equal applicability.

The lengthy history of the respondent's alcoholism was presented to establish the probability that his addiction was substantially the cause of the misappropriation. What the majority calls a generalized claim that the theft was caused by alcoholism was Vincent's attempt to draw the "connection," or the causal relationship, if you will. A rational trier of fact, the hearing court, could have found from that evidence that, more than being in the throes of alcoholism at the time he misappropriated client funds, the "root cause" of the respondent's misconduct was his alcoholism. Of course, it also could have found, as the majority has done, that it was insufficient. But it is the trial court, not this court, that should have initially made that call. Only in the most obvious circumstance should we preclude or discourage it from doing so. This is not such an obvious circumstance.

I do not disagree with the majority, I repeat, that more than an historical recitation is required. I am satisfied, as is it, that the alcoholism must be the root cause of the misconduct or have triggered it. I do not agree that the evidence in this case is insufficient, as a matter of law, to establish that connection. A remand is necessary in order that the hearing court may decide if the evidence offered convinces it that there is the requisite causal relationship.