ATTORNEY GRIEVANCE COMMISSION OF
MARYLAND *v.* HAROLD DEUTSCH,
JACK CWEIBER and MARTIN
B. LEVINSON

[Misc. (BV) Nos. 17, 18 & 19, September Term, 1981.]

*Decided October 5, 1982.*

The causes were argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Melvin Hirshman, Bar Counsel,* with whom was *Glenn M. Grossman, Assistant Bar Counsel,* on the petition, for petitioner.

*Marvin J. Land* for respondent Harold Deutsch. *Gerald P. Martin,* with whom was *Arnold M. Weiner* on the exceptions for respondent Jack Cweiber. *Andrew J. Graham* for respondent Martin B. Levinson.

RODOWSKY, J., delivered the opinion of the Court. ELDRIDGE, J., concurs in the result.

This disciplinary proceeding involves three attorneys who were all of the partners of a former law firm in Baltimore. They did not report their cash fees on the partnership or on their individual tax returns for 1974, 1975 and 1976. Two of the attorneys were convicted, upon guilty pleas, of violating 26 U.S.C. § 7206 (1) as to 1976. The third attorney was given immunity as the key government witness. Under § 7206 (1) any person who "[w]illfully makes and subscribes any return ... which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter" is guilty of a felony. This Court has previously said that the violation of § 7206 (1) is a crime involving moral turpitude. *Attorney Griev. Comm'n v. Lebowitz,* 290 Md. 499, 507, 431 A.2d 88, 92 (1981). Because the conduct involved dishonesty for personal gain and there are no compelling, extenuating circumstances in this case, we shall order disbarment.

The respondents are Jack Cweiber (Cweiber), who was admitted to the bar of this Court in 1960, Martin B. Levinson (Levinson), who was admitted in 1961, and Harold Deutsch

(Deutsch), who was admitted in 1970. When Cweiber's partnership with another attorney was dissolved, the respondents commenced practice January 1, 1973 as a new firm. Respondents' partnership terminated March 31, 1977 when Deutsch withdrew. Cweiber was managing partner and the principal business producer. The firm's practice was predominately plaintiffs personal injury work on a contingent fee basis.

In the fall of 1978, Deutsch learned that the United States Attorney's Office had issued a subpoena for the records of the respondents' firm. This was part of a broad investigation of fraudulent personal injury claims in the Baltimore area.[1] Deutsch engaged counsel and agreed to cooperate with the federal authorities in exchange for transactional immunity. Deutsch's disclosures resulted in criminal informations being filed against Cweiber and Levinson who pled guilty to violating 26 U.S.C. § 7206 (1) with respect to their individual returns for 1976.

At Levinson's arraignment on April 18, 1980 the Government made a statement of facts which, in its material aspects, was as follows:

> Deutsch would have testified that during 1973, '74, '75, '76, and up until he left the firm on April 1, 1977, it was the pervasive practice of the firm that none of the cash fees paid to the firm were reported by the firm on the partnership tax returns, prepared by Cweiber, nor by Cweiber, Levinson and Deutsch on their own individual income tax returns.
>
> Furthermore, Deutsch would have testified that these cash fees were customarily placed into white envelopes and divided up by Levinson, Cweiber and Deutsch every Friday afternoon or every other Friday afternoon. None of the money was ever recorded and reported on any tax returns, either by the partnership or by the individual partners. The

---

1. There is no suggestion in the record that the respondents committed any fraud in their representation of personal injury claimants.

only income reported by the firm were non-cash fees, and this information [i.e., reporting] was given through accountant Barry Glass, who prepared the partnership returns . . . .

Deutsch would have estimated that during the calendar year 1976, which is the subject of the one-count criminal information, approximately $20,000 in cash fees were received by the firm, with Cweiber receiving approximately $10,000 and Deutsch and Levinson each receiving $5,000.

Levinson's counsel then made certain corrections:

First of all, we accept such facts as are sufficient to constitute an offense under the statute. . . . There were certain aspects of the proffer, however, that we don't accept . . . .

First of all, the proffer concerns facts in years other than 1976, which we won't accept. This is a one-count information and it only concerns 1976 so I would ask the Court to draw no inference from the fact that other years were discussed in the proffer.

Second of all, we do not accept Mr. Deutsch's estimate of either the amounts which were divided outside the flow of the firm's business that was reported in its tax returns nor the frequency of the division of funds.

However, there were, as the statute requires, and we do admit, substantial funds, significant funds beyond those reported on the income tax returns.

THE COURT: Is that correct?

MR. LEVINSON: That's correct, your Honor.

Cweiber was arraigned immediately following Levinson. The Government read into the record as to Cweiber essentially the same statement of facts quoted above and Cweiber's attorney made essentially the same corrections as did Levinson's attorney. The court then addressed Cweiber and asked:

And with the corrections that were made by your attorney, do you agree to the operative facts in there, that you did falsify your income tax?

to which Cweiber replied:

Yes, I do, your Honor.

Deutsch acknowledged to this Court that he is no less culpable than the other respondents.

The inquiry panel hearing under Md. Rule BV6 d covered three days. The respondents, their accountant, their former file clerk and their former law clerk (later an associate attorney) testified, as well as numerous character witnesses. Because there are no records of the unreported income, the testimony is less than specific as to the amounts involved.

Cweiber estimated personal injury claims represented 90% of the fees earned by the firm. He attributed 4% to workmen's compensation cases and the remaining 6% to domestic relations and criminal (including traffic) matters. There were two bank accounts maintained by the firm, the general attorneys, or operating, account and the separate escrow account. Income generated from personal injury cases was in the form of checks received from insurers. These were deposited into the escrow account, from which the appropriate distributions were made, including distribution of legal fees to the firm. Fees were deposited into the attorneys account in the form of a check drawn on the escrow account. These fees were recorded and picked up by the accountant for financial and tax reporting. Fees in workmen's compensation cases, which were always in the form of an insurer's check, and fees paid by check in domestic and criminal matters, were also deposited, recorded and picked up by the accountant for financial and tax reporting. But in domestic and criminal matters, fees, or part payments on fees, would also be received in cash. Cash payments almost always were hand delivered by a client, and not mailed. The payment would be received by an available partner, or, if none were available, the employee who accepted payment would turn the cash over to a partner.

This cash was kept in a locked drawer in Cweiber's desk and used for business purposes and for personal, non-business purposes by the respondents.

The control point in the bookkeeping system at which income items were recorded was the deposit to the attorneys account. By the simple expedient of not depositing receipts of cash, respondents avoided ever bringing the cash income under reporting control.

Respondents' independent accountant told the inquiry panel that his engagement included maintenance of the firm's general ledger and preparation of quarterly and annual financial statements, of employer's reports, and of the partnership and partners' individual tax returns. His accounting firm also balanced the attorneys account checkbook, a task which respondents were unable to perform. The accountant obtained partnership income data from the deposits into the attorneys account. It was the accountant's understanding that all of the income of the firm was represented by deposits into the attorneys account from the escrow account, and the accountant had no responsibility with respect to the escrow account. At the inquiry panel hearing, the accountant was asked: "The only documents you looked at are the records for the attorney account and you assumed that all deposits in the attorney account reflected the sum of all income received by the firm?" He replied: "Yes, because that's what the principals of the firm told me. I had no reason to doubt their word." He did not believe that it was necessary for the firm to maintain a fee journal because of his understanding that all funds (trust or otherwise) received by the partnership were first deposited into the escrow account and that the fees earned by the firm were represented by deposits into the attorneys account of checks drawn on the escrow account.

Office personnel, in addition to the partners and file clerk, were three to four secretaries. No particular employee seems to have been assigned bookkeeping responsibility. Deposits to the accounts were made only once a week, usually on Fridays, by the file clerk. This clerk, who was in the firm's

employ from its inception until June of 1976, could recall only one or two instances when a deposit included cash. The weekly deposit was prepared as an ongoing tally. As fee checks or settlement checks were received, they were noted on the deposit slips under preparation for that week, with each item identified to the client and case. This information was also transcribed onto the stub of the account checkbook so that the items comprising a given week's deposits in an account could be identified. As conceived, this system could have embraced receipts both by check and cash, but the cash rarely reappeared from Cweiber's desk for deposit.

There was at least one other record from which the respondents might have reconstructed most of the amounts received in cash in order to include that income in tax returns. Receipts for cash payments were generally given. Throughout its existence, the firm acquired from a stationer and used books of preprinted receipts, which produce a write through carbon copy. There is no evidence that copies of these receipts were furnished to the accountants. Levinson believed the receipt copies were thrown away after a book of originals was used up, and after sufficient time had elapsed to indicate there would be no dispute with a client over the amount actually paid.

For a relatively brief period in the history of respondents' firm, they attempted to maintain a journal in which all fees would be recorded by the respondents as received. Cweiber described the origin of the journal in connection with the origin of the practice of keeping cash in his desk. Because bank deposits were made only once a week, a safe place was needed to retain, pending deposit, receipts in cash form. Cweiber had the only desk that had a working lock so that the cash was kept in an envelope in a drawer of his desk. Each of the other partners had a key to the desk. Cash payments were to be identified to the client and matter by a notation clipped to the currency or by placing the currency in an envelope which would have the identifying information written on it. Because the identifying information was not always put on cash payments, Cweiber in the latter part of 1973 purchased a journal, in which all fees were to be

recorded. However, after four or five pages were filled, the practice ceased. The accountant had no knowledge of any such journal and the respondents have no personal knowledge of its present whereabouts. Recording of receipts in the journal ceased by early 1974, at the latest.

No client, as a client, suffered any loss from the respondents' non-reporting of income. There were, in effect, individual client ledgers on the domestic and criminal cases. Each client's file contained a white card on which basic information was recorded. In domestic and criminal matters this information included the total fee. When part payments toward fee were received, in whatever form, a notation was made on the back of the card in the client's file. It appears that this record was only of amount, without indicating whether payment was by cash or check.

From time to time, sometimes weekly, sometimes bi-weekly, and at times at greater intervals, the partners divided the cash accumulated in Cweiber's desk in the same proportions as their respective partnership draws. This money was used by them for general living expenses. In the intervals between the division of accumulated cash, the accumulated cash was also used as a petty cash fund for business expenses, such as parking fees for clients, occasional cab fares for clients, incidental supplies, and dinners for staff who might be working in the evening. No record was made of expenditures from the cash kitty which would have qualified as deductions from firm gross income.[2]

Deutsch admitted to the inquiry panel that the cash distributions were not reported on the 1973 federal partnership tax return or on his individual return for that year. He admitted that the same was true with respect to the years 1974 through 1977. Levinson admitted that there was a division of cash fees from time to time in 1973, 1974 and 1975 as well as in 1976, but said that the amount of cash divided in the years other than 1976 was smaller than in 1976.

---

2. If the cash, after distribution, were used by an individual respondent for business expense, *e.g.*, entertaining clients, he kept no record of it. Cweiber told the panel, "[H]ow could you use money that you weren't paying taxes on and then claim a deduction for it."

Cweiber told the panel that fees were not reported in more years than just the year 1976.

Deutsch and Levinson said the amount of unreported income in 1973 was very small. None of the respondents was able to estimate the amount of unreported income for the years 1974 or 1975. Deutsch testified that for the year 1976 the amount was less than the $20,000 which he had estimated to the federal authorities. He said that estimate was high in order to protect himself under his immunity agreement. Levinson placed the amount for 1976 to be in the range of $12,000 to $15,000, while Cweiber said the total was more like $5,000 for 1976.

There is an additional aspect in the record which bears on unreported income. The petitions for disciplinary actions filed against Levinson and Deutsch also alleged them to have split fees due to the firm on certain workmen's compensation cases, without the knowledge of Cweiber. Levinson handled the workmen's compensation cases. Beginning in 1976, but possibly in 1975 according to Deutsch, he and Levinson began splitting compensation case fees received as checks payable to Levinson. Levinson deposited these checks to his personal account and drew on his personal account to the order of Deutsch for one-half. The total amount involved was possibly $5,000. Cweiber disclaimed any complaint on his part with respect to these transactions. From the standpoint of the partners' relationship, one to another, the trial court found no violation of any ethical duty and Bar Counsel takes no exception. However, Deutsch and Levinson told the inquiry panel that they did not report their respective portions of these fees on their income tax.

The inquiry panel, after a three day hearing, recommended that charges be filed against each respondent for violation of Disciplinary Rule (DR) 1-102 (A) (4), as to misrepresentation only, and for violation of DR 1-102 (A) (1).[3] The panel also recommended that the sanction be no

3. DR 1-102, adopted as part of Maryland Rule 1230, provides:
(A) A lawyer shall not:

   (1) Violate a Disciplinary Rule.

more severe than a suspension of not more than 30 days.[4] It was the panel's conclusion that respondents had not engaged in illegal conduct involving moral turpitude. Bar counsel apparently sought review by the Review Board of the panel's recommendation of dismissal, at least as to DR 1-102 (A) (3). *See* Rule BV6 d 4, (c) (ii). The Review Board directed Bar Counsel to file charges, including charging a violation of DR 1-102 (A) (3).[5]

Proceedings in the trial court were on the basis of the record developed before the inquiry panel, with supplemental evidence. The trial court concluded that each respondent had violated DR 1-102 (A) (4), but only on the basis of misrepresentation, and also DR 1-102 (A) (1). Misrepresentation was "[b]y signing an income tax return which he did not believe to be true and correct . . . ." It was found to extend at least from 1974 through 1976. The trial court further found "that there was no proof of an intent to defraud or to deceive." Bar Counsel has filed exceptions to the failure of the trial court additionally to find violations of subsections (3), illegal conduct involving moral turpitude, (5), conduct prejudicial to the administration of justice and, (6), conduct adversely reflecting on fitness to practice law.

The trial court also found as a fact "that the net tax consequences of [each Respondent's] action is not substantial" and that respondents were "sloppy and careless in the manner in

---

(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

**4.** Under Maryland Rule BV6 d4 (a), an inquiry panel recommends either dismissal of the complaint, reprimand, or that charges be filed. There is no provision for a recommendation by an inquiry panel as to sanction.

**5.** This step in the procedure appears in the present record only with respect to Cweiber. Cweiber filed a motion in the court below which claimed variances between the panel recommendation, the Review Board direction to Bar Counsel and the charges actually filed. That motion seems not to have been ruled upon. None of the respondents asserts any procedural irregularity as part of his exception in this Court.

which they maintained their internal books and records." Bar Counsel excepts to each of these findings.

Deutsch has filed no exceptions. Cweiber and Levinson except to the findings (1) that there were "some amounts" of cash income not reported for the years 1974, 1975 and "possibly" for 1973; (2) of violation of subsection (4), because they assert the non-reporting was due to inattention, negligence or carelessness; and (3) of violation of subsection (1). Levinson and Cweiber further contend there is no proof of a material omission on the income tax returns for any year other than 1976.

The principal exception before us is that of Bar Counsel to the trial court's failure to find a violation of the crime of moral turpitude subsection of DR 1-102 (A). In *Attorney Griev. Comm'n v. Lebowitz, supra,* 290 Md. 499, the respondent had been convicted under 26 U.S.C. § 7206 (1) when he willfully failed to report $4,780 of additional taxable income on his individual return. We said (*id.* at 507, 431 A.2d at 92):

> The felony of which Lebowitz was convicted involves moral turpitude. *Attorney Grievance v. Swerdloff,* 279 Md. 296, 379 A.2d 75 (1977). Lebowitz's conviction conclusively establishes that he willfully subscribed to a false federal income tax return substantially understating his gross income by a declaration made under penalties of perjury. See *Maryland St. Bar Ass'n v. Rosenberg,* 273 Md. 351, 329 A.2d 106 (1974).

*Swerdloff,* referred to in *Lebowitz,* involved an attorney who pled guilty to a § 7206 (1) violation. Our order of disbarment appended the memorandum and recommendation of the trial court which classified the offense as one involving moral turpitude. In *Swerdloff,* the respondent conceded before the trial court that the crime did involve moral turpitude and Swerdloff took no exceptions. *Lebowitz* similarly came before this Court without exceptions having been filed.

The respondents in this case in substance ask us to reconsider that part of the holding in *Lebowitz* which

classified the § 7206 (1) violation as involving moral turpitude and which there resulted in a disbarment. Respondents see the offense under § 7206 (1) as falling between willful tax evasion under 26 U.S.C. § 7201 and willful failure to file in violation of 26 U.S.C. § 7203. The former offense is per se one of moral turpitude, *see Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974), while the latter may or may not involve moral turpitude, depending upon the facts, *see Attorney Griev. Comm'n v. Gilland,* 293 Md. 316, 443 A.2d 603 (1982); *Attorney Griev. Comm'n v. Barnes,* 286 Md. 474, 408 A.2d 719 (1979); *Attorney Grievance Comm'n v. Walman,* 280 Md. 453, 374 A.2d 354 (1977). Respondents say that the § 7206 (1) offense is more like willful failure to file because § 7206 (1) contains no element of an intent to evade taxes, and because it does not require a finding of bad purpose or evil motive. The willfulness element of § 7206 (1) is satisfied by a voluntary, intentional violation of a known legal duty. *See United States v. Pomponio,* 429 U.S. 10, 97 S. Ct. 22, 50 L. Ed. 2d 12 (1976).

This argument by the respondents focuses on the willfulness element of § 7206 (1) and disregards the element that the taxpayer "does not believe [the return] to be true and correct as to every material matter." In *Pomponio,* the Supreme Court referred to the crime under § 7206 (1) as "falsifying tax returns." 429 U.S. 10. *Pomponio* approved a trial court instruction that the defendants were not guilty of violating § 7206 (1) "unless they had signed the tax returns knowing them to be false," and had done so willfully. *Id.* at 11. The approved instruction included finding that the taxpayers made the return " 'with the specific intent and knowledge at the time they made it that it was in fact a false return.' " *Id.,* n.2.

The element of known falsehood in a return verified under the penalties of perjury, which is required by § 7206 (1), distinguishes it from the willful failure to file offense as to moral turpitude. The Revenue Act of 1942 removed the requirement that individual income tax returns be made under oath. Only a verification under the penalty of perjury

was required under § 145 (c) of the Internal Revenue Code of 1939. The purpose of § 145 (c), which is virtually identical to § 7206 (1), was "to impose the penalties for perjury upon those who willfully falsify their returns regardless of the tax consequences of the falsehood." *Gaunt v. United States,* 184 F.2d 284, 288 (1st Cir. 1950), *cert. denied,* 340 U.S. 917, 71 S. Ct. 350, 95 L. Ed. 662 (1951).

In 1949, § 145 (c) was repealed and a new section, § 3809 (a), was enacted. In 1954, § 3809 (a) was replaced by the present day § 7206 (1). The only difference among §§ 145 (c), 3809 (a) and 7206 (1) is in the severity of the penalty. The courts still attribute the same purpose to § 7206 (1). *See, e.g., United States v. Beasley,* 519 F.2d 233, 245 (5th Cir. 1975), *vacated on other grounds,* 425 U.S. 956, 96 S. Ct. 1736, 48 L. Ed. 2d 201 (1976) (The purpose of § 7206 (1) is to impose penalties for perjury upon those who willfully falsify their returns regardless of tax consequences.); *United States v. Romanow,* 509 F.2d 26, 28 (1st Cir. 1975) (The primary purpose of § 7206 (1) is to impose the penalties of perjury upon those who willfully falsify their returns.); *United States v. DiVarco,* 484 F.2d 670, 673 (7th Cir. 1973), *cert. denied,* 415 U.S. 916, 94 S. Ct. 1412, 39 L. Ed. 2d 470 (1974) (One of the more basic tenets running through § 7206 (1) cases is that the purpose is to prosecute those who intentionally falsify their tax returns regardless of the precise ultimate effect that the falsification may have.); *United States v. Lodwick,* 410 F.2d 1202 (8th Cir. 1969), *cert. denied,* 396 U.S. 841, 90 S. Ct. 105, 24 L. Ed. 2d 92 (1969); *United States v. Tadio,* 223 F.2d 759, 761 (2d Cir. 1955), *cert. denied,* 350 U.S. 874, 76 S. Ct. 119, 100 L. Ed. 772 (1955) (Sec. 3809 (a) imposes the penalties for perjury upon those who willfully falsify their returns.). *See also Hoover v. United States,* 358 F.2d 87 (5th Cir. 1966), *cert. denied,* 385 U.S. 822, 87 S. Ct. 50, 17 L. Ed. 2d 59 (1966) (Sec. 7206 (1) is similar in nature to a perjury prosecution which makes the gravamen of the offense false swearing as to a material matter.).

In *Walman,* 280 Md. at 459, we said that "moral turpitude" has been defined generally

> as importing "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." [cit. om.] When applied to the context in which we deal with it here, the term connotes a fraudulent [cit. om.], or *dishonest* [cit. om.] intent. [Emphasis added.]

Knowingly to falsify a tax return by understating income is dishonest. The offense under § 7206 (1) is one involving moral turpitude. The convictions of Cweiber and Levinson establish the commission of the crime. *See Bar Ass'n of Balto. City v. Siegel,* 275 Md. 521, 340 A.2d 710 (1975); *Bar Ass'n of Balto. City v. Snyder,* 273 Md. 534, 331 A.2d 47 (1975); Rule BV10 e 1. Deutsch's conduct, established by admission as opposed to conviction, is no different. Bar Counsel's exception to the failure to find a violation of DR 1-102 (A) (3) is granted.

We turn to the question of sanction. "[W]hen a member of the bar is shown to be willfully dishonest for personal gain by means of fraud, deceit, cheating or like conduct, absent the most compelling extenuating circumstances ... disbarment follow[s] as a matter of course." *Maryland St. Bar Ass'n v. Agnew, supra,* 271 Md. at 553, 318 A.2d at 817. The burden of proof is on each respondent to show extenuating circumstances.

But for the understatement of income, the respondents' professional records are unblemished, both prior to the formation of their firm, and during the period of their practices following dissolution of Cweiber, Levinson & Deutsch. Each enjoys the esteem of professional colleagues who testified on their behalf at the panel proceedings. They are, in varying degrees, active in civic and charitable affairs. Each respondent has been found to be remorseful. The amount of tax liability had not been determined by the time of hearing before this Court. The trial court found that the amount of tax liability was "not substantial" and that there had been only a "minimal amount of personal gain."

Considerable time was devoted before the panel to testimony concerning the difficulty which the respondents at times had in meeting fixed expenses of the firm because the flow and amounts of fees were uneven. There were times when the partners were unable to take their agreed upon weekly draws. Cweiber and Levinson are each divorced and supporting dependents from their prior marriages. Cweiber has a child with Down's Syndrome, and Levinson's present wife has been hospitalized nine times. These do not constitute compelling extenuating circumstances, particularly in comparison to the reported income as developed from tax returns presented to the inquiry panel.[6]

The trial court's finding that the firm was "sloppy and careless in the manner in which they maintained their internal books and records" is not a mitigating factor. The evidence supporting this finding primarily related to matters like maintenance of payroll records, the coding of expense disbursements from the attorney account for posting to the computerized general ledger, and reconciling the checkbook to bank statements. All of these were records which the firm tried to maintain. The misrepresentations involved here arise from the absence of any effort, at least in 1974, 1975

---

**6.** The panel's report presented the following summary:

| | 1973 | 1974 | 1975 | 1976 | 1977 (to 3/31) |
|---|---|---|---|---|---|
| PARTNERSHIP INCOME: | | | | | |
| (1) Gross Revenues: | $266,351 | 253,991 | 286,946 | 238,986 | 67,414 |
| (2) Expenses: | 82,998 | 87,109 | 98,485 | 101,572 | 26,586 |
| (3) Distributable Income to Partners: | 183,353 | 166,882 | 188,461 | 137,414 | 40,828 |
| ALLOCATION AMONG PARTNERS OF ITEM (3) ABOVE: | | | | | |
| Cweiber: | 126,115 | 106,366 | 109,741 | 81,069 | 23,160 |
| Levinson: | 28,619 | 30,258 | 39,359 | 28,160 | 7,634 |
| Deutsch: | 28,619 | 30,258 | 39,359 | 28,185 | 10,034 |
| INCOME TAXES PAID: | | | | | |
| Cweiber — Federal | 38,027 | 11,125 | 2,535 | 6,415 | |
| State | | Not requested by panel. | | | |
| Levinson — Federal | 4,111 | 4,647 | 5,978 | 2,577 | |
| State | 1,111 | 1,289 | 1,532 | 639 | |
| Deutsch — Federal | 4,962 | 5,609 | 7,230 | 3,179 | 3,731 |
| State | 1,367 | 1,451 | 1,812 | 977 | 1,452 |

and 1976, to maintain any record of cash received that was to be retained for tax reporting purposes.

This leads to the factor which dictates our conclusion that the mitigating circumstances presented are not ones which compel a sanction short of disbarment. Here, there was a crime of moral turpitude with respect to each respondent's return for 1976. The falsifying of those returns was admittedly intentional and could only have been for personal gain, even if each respondent's gain was "minimal." But added to that crime is the misrepresentation found by the trial court to be applicable to the 1974 and 1975 returns as well. We need not determine whether the facts mount up to proof beyond a reasonable doubt of the crime of violating 26 U.S.C. § 7206 (1) as to 1974 and 1975. In these proceedings the issue concerns violation of the disciplinary rules. It is clear that the same conduct which led to the convictions and need for immunity as to 1976 was practiced as to 1974 and 1975. For those years, as well as for 1976, the respondents systematically avoided passing cash through their books. By signing returns which they had to know could not have included their cash income, they misrepresented their income to the taxing authorities. We do not deal here with a single episode. Rather, it is a pattern of misrepresentation.

Respondents contend that disbarment is inappropriate here because that sanction's purpose is not to punish. The contention is answered by *Attorney Griev. Comm'n v. Kahn,* 290 Md. 654, 431 A.2d 1336 (1981) where we said, quoting *Bar Ass'n of Balto. City v. Siegel,* 275 Md. 521, 528, 340 A.2d 710, 714 (1975):

> "Because 'an attorney's character *must remain beyond reproach'* this 'Court has the duty, since attorneys are its officers, to insist upon the *maintenance* of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute. Disciplinary proceedings have been established for this purpose, not for punishment, but rather as a catharsis for the

profession and a prophylactic for the public.' " [290 Md. at 683, 431 A.2d at 1352 (emphasis in original).]

The names of Jack Cweiber, Martin B. Levinson and Harold Deutsch will be stricken from the rolls of those authorized to practice law in this State.

> *It is so ordered; respondents shall pay all costs as taxed by the Clerk of this Court, including the costs of all transcripts, pursuant to Maryland Rule BV15 c for which sum judgment is entered in favor of the Attorney Grievance Commission against Jack Cweiber, Martin B. Levinson and Harold Deutsch.*

Eldridge, J., concurs in the result.