492 A.2d 905

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Felix Saul JACOB.

Misc. Docket (Subtitle BV) No. 21, Sept. Term, 1984.

Court of Appeals of Maryland.

May 29, 1985.

Melvin Hirshman, Bar Counsel and Kendall Calhoun, Asst. Bar Counsel to Atty. Grievance Com'n of Maryland, Annapolis, for petitioner.

Robert W. Hesselbacher, Jr., Baltimore, for respondent.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, RODOWSKY, COUCH and McAULIFFE, JJ.

SMITH, Judge.

Bar Counsel, acting pursuant to the provisions of Maryland Rule BV9, filed a petition with us seeking disciplinary action against Felix Saul Jacob, a member of the Maryland Bar since November 3, 1955. He charged that Jacob violated Disciplinary Rule 1–102(A)(1), (3), (4), (5), and (6).[1]  This

---

1. This rule states in pertinent part:
   "DR 1–102 Misconduct.
   (A) A lawyer shall not:
       (1) Violate a Disciplinary Rule.
       (2) . . .

action was based upon the conviction of Jacob in the United States District Court for the District of Maryland of subscribing to a false federal income tax return for the year 1975 in violation of 26 U.S.C. § 7206(1).[2]  We shall disbar.

## I

Pursuant to Rule BV9 b we referred the matter for hearing to a judge of the Third Judicial Circuit of Maryland. He filed with us a comprehensive opinion with findings of fact and conclusions of law.  He found the previously mentioned conviction in the United States District Court. The judge said:

> "The case was submitted to the [United States District] Court in a Stipulation signed by the Respondent (Petitioner's exhibit 6).  The underlying facts are that for the tax year 1975 Respondent failed to report $2,788.32 taxable income when he filed his Return on June 16, 1976.  It should be noted that Respondent neglected to claim $3,002.00 in alimony allowances to which he was entitled. Therefore, his actual tax liability, it appears, would have been less than stated on the Return."

The stipulation to which the trial judge referred stated in paragraph 5:

---

(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

**2.**  At the time of Jacob's conviction 26 U.S.C. § 7206(1) provided that "[a]ny person who—[w]illfully makes and subscribes any return ... which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both ...."

Subsequent to Jacob's conviction 26 U.S.C. § 7206 was amended to provide for the possible imposition of much greater fines.

"During the year 1975, in connection with the settlement of cases for the clients listed below, Mr. Jacob caused to be issued, in addition to checks to the clients which were deposited or otherwise utilized by the clients, additional checks which were endorsed by the clients and cashed by Mr. Jacob:

| Name | Amount of Cashed Check | Date of Negotiation |
| --- | --- | --- |
| Wilbert Holland | $ 750.00 | 4/17/75 |
| Wilbert Holland | 1,200.00 | 4/17/75 |
| Alda Nickens | 1,000.00 | 5/08/75 |
| William Nickens | 200.00 | 5/08/75 |
| Gene Riddell | 560.00 | 5/26/75 |
| Alice Myles | 400.00 | 6/18/75 |
| Elizabeth Christian | 1,000.00 | 7/30/75 |
| Carolyn Buchoff | 3,000.00 | 8/18/75 |
| William Gordon | 200.00 | 9/02/75 |
| Janet Green | 300.00 | 9/02/75 |
| Grafton Johnson | 164.35 | 10/29/75 |
| Grafton Johnson | 379.00 (PIP) | 10/30/75 |
| | $11,153.35 | |

"It is conceded that the aforesaid practice was intended to, and resulted in, a reduction in the amount of legal fee income reflected on the books and records of the law firm of Jacob and Goldstein. There is no issue between the Government and Mr. Jacob as to whether the practice resulted in any detriment to clients of the firm."

In his report to us the trial judge stated relative to the evidence offered in mitigation and by way of background:

"Respondent married Gwen Jacob in 1956 and they have an adopted son, Arthur Jacob, who is a C.P.A. and a last year law student at the University of Baltimore. They divorced in 1968 and he married Carole Belaga that same year. She has three (3) children by a previous marriage; Adam, who is now an attorney practicing in Vermont; Anne, who is studying nursing and about to graduate from the University of Maryland; Amy, who is a senior at Goucher College and who plans going on to law school. Respondent has a natural son from this marriage—David, who is age 15 and resides with his mother. By all accounts Respondent has been a devoted father who supported all five children quite adequately.

"Respondent and Carole Belaga separated in September, 1973 and were divorced in 1975. Apparently the break up of this marriage caused Respondent rather severe emotional and mental distress. Both former wives and his former mother-in-law (Mrs. Belaga's mother) testified that during this time (1973–1975) Respondent was depressed, unable to sleep without medication, shabbily and inappropriately dressed and behaved uncharacteristically.[1] Dr. Sheldon Kravitz, Respondent's physician of 25 years, testified that in 1974 and 1975 he noticed changes in him—depression, lack of personal care, slow response. Dr. Kravitz referred him to a psychiatrist, Dr. Bernard R. Shochet, who treated Respondent for a period of time, however the Court did not receive testimony from Dr. Shochet.

---

"[1]. At one point Respondent wore ear plugs and a blindfold because he could not tolerate noise and light. He wore inappropriately casual clothes to his law office and while on vacation in Acapulco, Mexico, he wore a shirt with the words 'Acapulco Gold' across the front."

"Attorneys William R. Goodman and John P. Nugent, Jr., who have known Respondent for 40 years and 16 years, respectively, also testified to his depressed mental state during 1973 and 1975.

"It is important to note that throughout this relevant period of time Respondent represented clients competently and without complaint, notwithstanding his depression and unusual behavior.

"Major Joseph Zerhusen, Major Paul Wolinski and Patrolman Robert L. Hux testified, and Captain Joseph M. Poag and Major Anthony J. Vitek, Jr. submitted letters which were considered by the Court. These witnesses, who are clients of Respondent, are members of the Baltimore County Police Department. They uniformly praised Respondent for his attention to their cases and expressed the belief that he is competent and reliable. Major Vitek stated that he found Respondent to be 'thoroughly trustworthy'. Each of the other witnesses expressed confidence in Respondent's ability and competence."

The trial judge quoted that portion of DR 1–102(A) which we have set forth in footnote 1 and then "conclude[d] by clear and convincing evidence that Respondent's conviction amounts to misconduct in that he 'engaged in illegal conduct involving moral turpitude.' "

The trial judge addressed Jacob's mental state in his conclusion, saying:

"Respondent contends that his mental state was the cause of the misconduct. Although this Court believes the trauma and stress of the break up of his second marriage to be a mitigating factor, this Court does not conclude that the Respondent suffered such an emotionally or mental upset or illness which was substantially and casually [sic] related to the misconduct."

## II

Jacob first argues that his case should have been sent to an Inquiry Panel so that he would "have had the opportunity for an evidentiary hearing before his peers."

Rule BV6 b 1 provides in pertinent part:

"An Inquiry Panel proceeding is not required in a case where either:

"(a) . . .

"(b) The complaint is either (i) that there has been a final judgment of conviction as defined by Rule BV10 e 1 of a crime punishable by imprisonment for more than one year; or (ii) that the attorney has been adjudged guilty of misconduct by a judicial tribunal in a disciplinary proceeding as defined by Rule BV10 e 1 and that the adjudication of misconduct has become final."

Rule BV10 e 1 states in pertinent part:

"In a hearing of charges pursuant to this Rule, a final judgment by a judicial tribunal in another proceeding convicting an attorney of a crime shall be conclusive proof of the guilt of the attorney of that crime. . . . A final adjudication in a disciplinary proceeding by a judicial tribunal or a disciplinary agency appointed by or acting at

the direction of a judicial tribunal that an attorney has been guilty of misconduct is conclusive proof of the misconduct in the hearing of charges pursuant to this Rule."

Jacob's conviction met the terms of Rule BV10 e 1 in that it was final. It was for a crime punishable by imprisonment for more than one year. Hence, it met the criteria of Rule BV6 b 1.

In *Attorney Griev. Comm'n v. McBurney*, 282 Md. 116, 120–21, 383 A.2d 58, 61 (1978), we reviewed the procedures under the present disciplinary rules. We then said:

"It is the 'complaint that an attorney has committed an act of misconduct' which is referred to the Inquiry Panel. In this instance it was a complaint that McBurney received money on behalf of his client from an insurance company and then failed to pay over to his client that which was due, having issued two checks therefor which were not honored by the bank on which they were drawn by reason of McBurney's having an insufficient amount on deposit in his account. We regard this procedure as similar to a grand jury presentment. A presentment is said by L. Hochheimer, *Criminal Law* § 84 (2d ed. 1904), to be 'an informal accusation of crime by a grand jury, upon which the prosecuting attorney afterwards frames a bill of indictment.' 42 C.J.S. *Indictments and Informations* § 7b (1944) refers to it as being 'regarded, in the practice at common law and under some of the statutes, as nothing more than instructions by the grand jury to the public prosecutor for framing a bill of indictment, which, being prepared by him, is submitted to them and found a true bill.'" 282 Md. at 122, 383 A.2d at 62.

In a case such as Jacob's where there has been a conviction there is no need for a preliminary finding as to whether there are facts which would be the basis of a disciplinary action. The conviction speaks for itself. The integrity of the criminal conviction cannot be attacked in a disciplinary proceeding by requesting this Court to reweigh

or to reevaluate the respondent's guilt or innocence. *Attorney Griev. Commission v. Barnes,* 286 Md. 474, 479, 408 A.2d 719, 722 (1979); *Maryland St. Bar Ass'n v. Rosenberg,* 273 Md. 351, 355, 329 A.2d 106, 108 (1974).

We regard this contention of Jacob as without merit.

### III

Jacob next contends that the trial judge "erred in concluding that [Jacob's] severely depressed and upset mental and emotional state during the period 1973–1975 was not substantially or causally related to his misconduct." There is no evidence that respondent's mental problems caused his misconduct. The trial judge noted "that throughout this relevant period of time Respondent represented clients competently and without complaint, notwithstanding his depression and unusual behavior."

It was not a single item of income which was omitted from Jacob's tax return. He engaged in a pattern of conduct similar to that before the Court in *Attorney Griev. Comm'n v. Deutsch,* 294 Md. 353, 450 A.2d 1265 (1982). In that case Judge Rodowsky said for the Court:

"The falsifying of those returns was admittedly intentional and could only have been for personal gain, even if each respondent's gain was 'minimal.' ... By signing returns which they had to know could not have included their cash income, they misrepresented their income to the taxing authorities. We do not deal here with a single episode. Rather, it is a pattern of misrepresentation." 294 Md. at 368, 450 A.2d at 1273.

The trial judge did not err in holding that the evidence did not show Jacob's mental problems were the cause of his misconduct.

### IV

We turn to the issue of sanction. We note, as claimed by Jacob and found by the trial judge, that by reason of his unclaimed alimony deduction there may have

been no tax liability on the part of Jacob in excess of that stated in his return. We point out that in *Deutsch* we indicated that "each respondent's gain was 'minimal.' " The amount of tax liability is not the point. The conviction here was not for tax evasion but of having falsely sworn under the penalties of perjury to a tax return. In *Deutsch* we held, "Knowingly to falsify a tax return by understating income is dishonest. The offense under § 7206(1) is one involving moral turpitude." 294 Md. at 366, 450 A.2d at 1271. In addition to the attorneys in *Deutsch,* we have disbarred in *Attorney Griev. Comm'n v. Lebowitz,* 290 Md. 499, 431 A.2d 88 (1981), and *Attorney Grievance v. Swerdloff,* 279 Md. 296, 369 A.2d 75 (1977), where attorneys also understated their gross income and were convicted of violations of the same federal statute as in the case at bar.

In *Bar Ass'n of Balto. City v. Siegel,* 275 Md. 521, 340 A.2d 710 (1975), Judge Digges said for the Court:

"[B]ecause 'an attorney's character *must remain beyond reproach,*' this 'Court has the duty, since attorneys are its officers, to insist upon the *maintenance* of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute. Disciplinary proceedings have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public.' " 275 Md. at 528, 340 A.2d at 714 (emphasis in original).

Jacob could have had but one purpose and one purpose only in his scheme and that was to avoid a part of his tax liability.

What Judge Digges said for the Court in *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974), continues to be relevant:

"[T]his Court has consistently adhered to the view, both prior to 1970 (when we reviewed disciplinary actions only on appeal at the instance of the respondent-attorney), *Balliet v. Balto. Co. Bar Ass'n,* [259 Md. 474, 270 A.2d 465 (1970) ]; *Fellner v. Bar Ass'n,* [213 Md. 243, 131 A.2d

729 (1957) ]; *In the Matter of Lombard,* 242 Md. 202, 218 A.2d 208 (1966); *In Re Williams,* 180 Md. 689, 23 A.2d 7 (1941); and since that date (when we assumed original and complete jurisdiction over these proceedings), *Bar Ass'n v. Marshall,* [269 Md. 510, 307 A.2d 677 (1973)]; *Bar Ass'n v. Cockrell,* 270 Md. 686, 313 A.2d 816 (1974); *Maryland St. Bar Ass'n v. Callanan,* 271 Md. 554, 318 A.2d 809 (1974), that when a member of the bar is shown to be willfully dishonest for personal gain by means of fraud, deceit, cheating or like conduct, absent the most compelling extenuating circumstances, not shown to be present here, disbarment followed as a matter of course. To do other than disbar the respondent in this case, therefore, would constitute a travesty of our responsibility." 271 Md. at 553, 318 A.2d at 817.

To similar effect *see Attorney Griev. Comm'n v. Nothstein,* 300 Md. 667, 687–88, 480 A.2d 807, 817–18 (1984); *Attorney Griev. Comm'n v. Woodward,* 299 Md. 429, 435, 474 A.2d 208, 211 (1984); *Attorney Griev. Comm'n v. Noren,* 293 Md. 611, 614, 446 A.2d 423, 424 (1982).

It follows that Jacob must be disbarred.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST FELIX SAUL JACOB.