499 A.2d 479

## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

### John Henry NEWMAN, Jr.

### Misc. (Subtitle BV) No. 13 Sept. Term, 1984.

Court of Appeals of Maryland.

Nov. 5, 1985.

Melvin Hirshman, Bar Counsel and Glenn M. Grossman, Asst. Bar Counsel, Annapolis, for the Attorney Grievance Comm. of Maryland.

Francis S. Brocato, Baltimore, for respondent.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

SMITH, Judge.

Bar Counsel, acting pursuant to the provisions of Maryland Rule BV9, filed a petition with us seeking disciplinary action against John Henry Newman, Jr., a member of the Maryland Bar since June 20, 1974. The complaint was based upon Newman's conviction in the United States District Court for the District of New Jersey of violation of 18 U.S.C. §§ 1341 and 1342 (mail fraud and aiding and abetting). Upon the basis of this conviction we had suspended Newman from the practice of law in Maryland under Rule BV16 prior to that petition. We shall disbar.

Pursuant to Rule BV9 b we referred the matter for hearing to one of the judges of the Circuit Court for Baltimore City. He reported:

## "FINDINGS OF FACT

"The Respondent who presently resides at 1241 Battery Avenue in Baltimore City, is a 41 year old lawyer who was admitted to the Bar of Maryland on June 20, 1974, having graduated in 1974 from the University of Baltimore Law School.

"Prior to and during his law school career Mr. Newman worked for several insurance companies. He first went to work for Liberty Mutual as a Claims Adjustor in 1968. During his last year of law school he terminated his employment as a Claims Adjustor with Liberty Mutual and was hired as a supervisor at Maryland Casualty Company. As a supervisor his duty was to supervise claims adjustors in their investigation and then to evaluate the efficiency of their investigations and recommenda-

tions. Within a year after assuming his duties with Maryland Casualty the Respondent was promoted to the position of Home Office Examiner whereupon he supervised offices across the country relative to the handling of civil claims such as workmen's compensation, products liability and negligence claims. He left Maryland Casualty in 1979 in order to pursue a private practice. In less than a year, however, he applied for and received employment with the Claims Department of Chubb and Son, Inc. His position was in the Claims Department of the Baltimore office of that company. Towards the end of 1979, however, he was transferred to the Philadelphia office as a Liability Claims Supervisor. Within approximately one year thereafter the Respondent received a promotion and was thereupon transferred to the company's office in Shorthills, New Jersey. He there occupied the position of Home Office Examiner. He received a subsequent promotion to Senior Claims Officer which is roughly equivalent to Assistant Vice President. Mr. Newman's salary at that time was approximately $35,000.00 per year and he was not engaging in the practice of law. In the latter part of 1982, however, he was terminated by Chubb as a result of having attended a staff meeting while under the influence of alcohol. Shortly thereafter he was employed by Medical Mutual Insurance Company as a Claims Supervisor receiving income of approximately $33,000.00 per year. His work with that company was terminated subsequent to his having pled guilty in the United States District Court of New Jersey to mail fraud charges, in violation of Title 18, Section 1341 of the United States Code. He has held no employment since then.

"Mr. Newman is an alcoholic. He began the use of alcohol to the point of intoxication during the early 1960's while he was a student at Georgetown University. His wife frequently joined him and other company members and their wives in gatherings where alcoholic beverages were liberally consumed. She did not consider this in anyway abnormal nor did she observe that there was any

misbehavior on the part of the company members and/or their wives. In 1976 Mr. Newman was arrested and convicted for driving while intoxicated and placed on probation. He was convicted of the same offense in October 1983 and again placed on probation. Among the conditions of probation was the requirement that Mr. Newman attend three meetings per week of Alcoholics Anonymous. In November 1983 after the second DWI charge, he contacted Mr. Richard Vincent, Director of Lawyer Counselling for the Maryland State Bar Association. It was during the same period of time that the Respondent was seen by Dr. John Henderson, Psychiatrist and Dr. John E. Davis, Associate Professor of Family Medicine. The Respondent, however, did not reveal to any of these professionals that he was being investigated by a Federal Grand Jury or that a Federal Indictment was returned against him on January 25, 1984, relative to mail fraud charges. He entered a guilty plea on May 11, 1984, to the 17th count of that indictment which count charged a violation of Title 18, Sections 1341 and 1342 of the United States Code.

"Mr. Newman was thereupon given a five year sentence which was suspended and a five year probationary period was imposed. Among the conditions of probation were the requirements that the Defendant, Mr. Newman, pay a fine of $1,000.00, continue treatment for alcoholism as an in-patient at the Shepherd Pratt Hospital and that he make restitution to Chubb & Son, Inc. in the amount of $37,600.00 at the rate of $1,000.00 per month.

"The specific violations on which the Federal Indictment was based are as follows:

"While an employee of Chubb & Son, Inc. the Respondent had many occasions to deal with an investigative company headed by one John A. Kennedy, with whom he had dealt during the time he was employed by the Maryland Casualty Company. During the period from September 1979 to February 1982, the Respondent conspired with John A. Kennedy to defraud the Respondent's em-

ployer of various sums of money. This conspiracy was consummated by the systematic issuing of drafts to Mr. Kennedy either for investigative work that had [not] been performed or in inflated amounts for services which had been performed. Mr. Kennedy in return would forward to the Respondent a portion of those fraudulent payments. The Respondent, subsequent to his separation from Chubb & Son, Inc., on or about May 21, 1983 and again on or about June 18, 1983, flew from Baltimore to Chicago to meet with John A. Kennedy and prepare false documents to be submitted to Chubb & Son, Inc.

"Having carefully reviewed and weighed the evidence as to the totality of the circumstances, this court is of the opinion, and therefore finds that no causal relationship existed between Mr. Newman's alcoholism and his criminal activity which triggered these proceedings. All available evidence indicates that he functioned well in the various aspects of his life without any mental or moral deterioration or impairment as a result of his consumption of alcohol. The fraud perpetrated against Chubb involved a skillfully prepared and carefully executed scheme which continued for a period in excess of two years."

Newman recognizes that pursuant to Rule BV10 e 1 his misconduct is established by his conviction. He excepts, however, to the trial judge's finding that there was no causal relationship between his problems with alcohol and his criminal conduct. He seeks an indefinite suspension.

Newman's problems with alcohol are not disputed. The trial judge heard testimony on behalf of Newman from Dr. John E. Davis, Associate Professor of Family Medicine at the University of Maryland; Richard Vincent, Director of the Lawyer Counseling Committee of the Maryland State Bar Association; and Dr. John M. Henderson, a psychiatrist. Dr. Robin Hostetter, a psychiatrist associated with the office of the Chief Medical Officer of the Circuit Court for Baltimore City, testified on behalf of the Commission. All agree that Newman is an alcoholic. Vincent said, "The

degree of severity of his alcoholism was as advanced as anyone that I have treated with three exceptions."

The experts disagreed on whether the alcoholism was responsible for Newman's criminal behavior. The record pertaining to Dr. Davis at one point is:

"A   There is no question he was impaired and that all aspects of his cognitive functioning was impaired.

"Q   How would that relate to these acts?

"A   Well, if you are not able to judge, if you are not able to accurately perceive and if you are not able to remember all the details of actions, it makes it very difficult for you to be consistent in your judgment, rational in your judgment and able to make good judgments that a normal unimpaired man would make.   So he would not have the ability to act as a normal man would act having had his brain dosed with the amount of alcohol that he was daily ingesting."

At another point on re-cross-examination the record reflects:

"Q   Dr. Davis, you testified just now that Mr. Newman was under the influence of a disease and that was a mitigating circumstance.   But you also are not testifying that the disease caused him to be involved in the criminal behavior;  is that correct?

"A   I can't say that.   I don't know anybody that can say that."

Dr. Henderson testified on direct examination:

"With regard to the substantial causal relationship, I felt again as it came slowly together in my mind, I felt by the time that I took the witness stand in New Jersey that there was a substantial causal relationship based on all of the things that I mentioned before, that whereas he does have an underlying personality disorder.   He had been [sic] abused and was dependent on alcohol for ten to fifteen years, that he had deterioration of his thinking because of the use of alcohol.   By May, he had certainly begun to improve radically, although I personally was

insistent that he still enter the hospital. I still felt that all of the psychosocial factors, which was his mother's and father's deaths and his wife's blindness was still preying on him. So I insisted on the hospitalization. I felt that on the basis of all of that and my entire clinical impression I saw no way to not say there was a substantial causal relationship between the alcoholism and the criminal behavior to which he pled guilty."

In his deposition Newman described his rejection of other opportunities he had had for misconduct while employed by Chubb and thus which overlapped his criminal conduct. Dr. Hostetter referred to this on cross-examination:

"Q (By Mr. Brocato:) Do you still stand by the proposition made in this paragraph that the only claim to deterioration consists of the mail fraud charge?

"A That the only claim of deterioration of moral decision making is the mail fraud charge, that I have said, and I believe that he had some impairments with his wife and he had some—You know, at the time I saw him he had a history of having been terminated from his job for alcoholism. Those are impairments in social or occupational functions due to alcoholism, but his impairments for moral decision making, in other words his Shall-I-do-it-or-not-do-it kinds of thinking, the only ones I see that— The only time he had any difficulty with that was with these particular mail fraud charges. Indeed, in the history taking we noticed that there were times when people had offered—I don't know if you'd call them bribes or gifts or whatever that he had turned down. This is during the same period of time that these charges are accumulating. I stand by the statement that—to say that when it came to this particular mail fraud scheme he was alcoholic and really not making good moral decisions on the basis of his alcoholism when everything else in his moral life had not been impaired, I don't see that you can attribute that to his alcoholism. It doesn't make psychiatric sense to me."

Without exception, when we have indefinitely suspended an attorney for misconduct where there was an involvement with alcohol there has been a finding to the effect that the misconduct was induced by the alcoholic condition. *See Attorney Griev. Comm'n v. Miller,* 301 Md. 592, 599, 483 A.2d 1281, 1285 (1984); *Attorney Griev. Comm'n v. Aler,* 301 Md. 389, 396, 483 A.2d 56, 60 (1984); *Attorney Griev. Comm'n v. Truette,* 299 Md. 435, 444, 474 A.2d 211, 216 (1984); *Attorney Griev. Comm'n v. Willemain,* 297 Md. 386, 392, 466 A.2d 1271, 1273–74 (1983); *Attorney Griev. Comm'n v. Dunphy,* 297 Md. 377, 384, 467 A.2d 177, 180 (1983); *Attorney Griev. Comm'n v. Finlayson,* 293 Md. 156, 158, 442 A.2d 565, 567 (1982); *Attorney Griev. Comm'n v. Flynn,* 283 Md. 41, 46, 387 A.2d 775, 778 (1978); *Attorney Grievance Comm'n v. Cooper,* 279 Md. 605, 606, 612, 369 A.2d 1059, 1062 (1977).

We have painstakingly reviewed the record here, including Newman's deposition. We cannot say that the trial judge's conclusion was clearly erroneous. As we have indicated previously, a trier of fact may elect to pick and choose which evidence to believe. *Miller,* 301 Md. at 603, 483 A.2d at 1287; *Attorney Griev. Comm'n v. Nothstein,* 300 Md. 667, 684, 480 A.2d 807, 816 (1984); *Attorney Griev. Comm'n v. Kerpelman,* 288 Md. 341, 354, 420 A.2d 940, 946 (1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981); *Clemson v. Butler Aviation,* 266 Md. 666, 671–72, 296 A.2d 419, 422 (1972); *Racine v. Wheeler,* 245 Md. 139, 144, 225 A.2d 444, 447 (1967). The trial judge has done exactly that. There is evidence to support his conclusion.

In this case the trial judge may well have taken into consideration the fact that during the period of Newman's abuse of alcohol he progressed from one more responsible position to another, including progress at Chubb, the place of his ultimate downfall. It is, of course, true that Newman was dismissed from Chubb, when, as he put it, he appeared at a serious staff meeting to discuss some extremely sensitive and expensive cases in a condition when

he "was three sheets to the wind ...." However, he was able to work out a scheme with Kennedy for substantial financial harm to Chubb.

We turn to the question of sanction. We have consistently adhered to the view that when a member of the Bar is shown to be willfully dishonest for personal gain by means of fraud, deceit, cheating or like conduct, absent the most compelling extenuating circumstances, not shown to be present here, disbarment followed as a matter of course. *See, for example, Attorney Griev. Comm'n v. Jacob,* 303 Md. 172, 181, 492 A.2d 905, 909–10 (1985); *Nothstein,* 300 Md. at 687, 480 A.2d at 817–18; *Attorney Griev. Comm'n v. Mandel,* 294 Md. 560, 587–88, 451 A.2d 910, 923 (1982); *Attorney Griev. Comm'n v. Noren,* 293 Md. 611, 614, 446 A.2d 423, 424 (1982); *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 553, 318 A.2d 811, 817 (1974). It follows that Newman must be disbarred.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JOHN HENRY NEWMAN, JR.